## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| AMERICAN SHRIMP PROCESSORS ASSOCIATION <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> PT BAHARI MAKMUR SEJATI, <br><br> Defendant-Intervenor. | **PUBLIC VERSION** <br><br> Ct. No. 25-00027 <br><br> Business Proprietary Information Identified by Single Brackets [ ] and Removed from Pages 9-15 and 20-21. |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the Court, the American Shrimp Processors Association ("ASPA" or "Plaintiff") hereby moves for judgment on the agency record in its appeal of the final determination by the U.S. Department of Commerce ("Commerce") in the antidumping investigation of frozen warmwater shrimp from Indonesia, published as *Frozen Warmwater Shrimp from Indonesia: Final Affirmative Determination of Sales at Less-Than-Fair Value,* 89 Fed. Reg. 85,498 (Dep't Commerce Oct. 28, 2024) ("*Final Determination*"). As demonstrated in the accompanying memorandum in support of its motion, certain aspects of Commerce's *Final Determination* are unsupported by substantial evidence and otherwise not in

accordance with law.

### **PROPOSED RELIEF**

Therefore, ASPA respectfully requests that the Court grant this motion for judgment on the agency record, remand this matter to Commerce for disposition consistent with the order and opinion of the Court, and order any additional relief that the Court may deem just and proper.

Respectfully submitted,

/s/ William A. Fennell
Roger B. Schagrin
Elizabeth J. Drake
William A. Fennell
Alessandra A. Palazzolo
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel to American Shrimp Processors Association*

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| AMERICAN SHRIMP PROCESSORS ASSOCIATION | |
| Plaintiff, | **PUBLIC VERSION** |
| v. | Ct. No. 25-00027 |
| UNITED STATES, | Business Proprietary Information Identified by Single Brackets [ ] and Removed from Pages 9-15 and 20-21. |
| Defendant, | |
| and | |
| PT BAHARI MAKMUR SEJATI, | |
| Defendant-Intervenor. | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR

## JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin
Elizabeth J. Drake
William A. Fennell
Alessandra A. Palazzolo
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel to American Shrimp Processors Association*

September 2, 2025

PUBLIC VERSION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT PURSUANT TO RULE 56.2 ....................................................................... 1

I.     Administrative Determination Under Review ............................................................ 1

II.    Issues Presented for Review ...................................................................................... 1

STANDARD OF REVIEW ............................................................................................... 2

STATEMENT OF FACTS ................................................................................................. 2

I.     History of the Case ..................................................................................................... 2

II.    Additional Facts Relevant to the Cost Issue ............................................................ 6

      A.    How Shrimp Are Processed and Measured ................................................... 6

      B.    How BMS Reported its Costs. ....................................................................... 8

III.   Additional Facts Relevant to the Financial Ratios Issue ....................................... 15

SUMMARY OF ARGUMENT ....................................................................................... 18

ARGUMENT .................................................................................................................. 19

I.     Commerce's Reliance on BMS's Cost Reporting Was Not Supported by Substantial Evidence and Otherwise Contrary to Law ............................................................... 19

II.    Commerce's Selection of PMMP's Financial Statement for Constructed Value Profit and Selling Expenses Was Unsupported by Substantial Evidence and Contrary to Law ....... 23

      A.    Commerce Deviated without Explanation from its Practice of Relying on Producers that Had the Majority of their Sales in the Home Market for Surrogate Profit and Selling Expenses. ................................................................................................ 23

      B.    If PMMP Had Been a Respondent, Commerce Would Not Have Relied on its Home Market sales for Normal Values. .......................................................... 27

CONCLUSION ............................................................................................................... 30

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) .................................................. 2

*CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016)............................ 27

*Ellwood City Forge Co. v. United States*, 654 F.Supp.3d 1268 (Ct. Int'l Trade, 2023).............. 22

*FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293 (2003) ............................................. 2

*Goodluck India Limited v. United States*, 11 F.4th 1335 (Fed. Cir. Aug. 31, 1021) ................... 27

*Huvis Corp. v. United States*, 525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007)................................. 2

*Hyundai Steel Co. v. United States,* 745 F.Supp. 3d 1345 (Court Int'l Trade, Dec. 12, 2024) .... 27

*Initiation* ................................................................................................................................. 8

*Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017)..................................... 21

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019) .............. 27, 29

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)
............................................................................................................................................. 22

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)......................................... 2

*Pro-Team Coil Nail Enterprise, Inc. v. United States,* 419 F.Supp. 3d 1319 (Ct. Int'l Trade,
2019) ................................................................................................................................... 22

*Pro-Team Coil Nail Enterprise, Inc. v. United States,* 483 F.Supp. 3d 1242 (Ct. Int'l Trade,
2020) ................................................................................................................................... 22

*Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) ...................................................... 29

*Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 24 C.I.T. 485,
102 F. Supp. 2d 486 (2000) ................................................................................................ 22

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)................................................ 23

*Tianjin Magnesium Int'l Co. v. United States*, 34 CIT 980, 722 F.Supp.2d 1322 (2010)........... 22

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................................................... 2

19 U.S.C. § 1677b(a)(4)............................................................................................................... 23

19 U.S.C. § 1677b(e) ................................................................................................................... 23

19 U.S.C. § 1677b(e)(1)......................................................................................................... 22, 23

19 U.S.C. § 1677b(e)(2)(A) ......................................................................................................... 23

19 U.S.C. § 1677b(e)(2)(B)(iii) ....................................................................................... 24, 25, 30

**Other Authorities**

Statement of Administrative Action for the Uruguay Round Agreements Act, H.R. Doc. 103–316
at 841 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4176................................................... 24

**Administrative Determinations**

*Certain Steel Nails From India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 47,719 (Dep't Commerce Aug. 4, 2022) .................................................................. 26

*Frozen Warmwater Shrimp from Ecuador and Indonesia: Initiation of Less-Than-Fair-Value Investigations*, 88 Fed. Reg. 81,043 (Dep't Commerce Nov. 21, 2023) .................................... 3

*Frozen Warmwater Shrimp from Indonesia: Antidumping Duty Order; Frozen Warmwater Shrimp From Ecuador, India, and the Socialist Republic of Vietnam: Countervailing Duty Orders*, 89 Fed. Reg. 104,982 (Dep't Commerce Dec. 26, 2024) ............................................ 6

*Frozen Warmwater Shrimp from Indonesia: Final Affirmative Determination of Sales at Less-Than-Fair Value,* 89 Fed. Reg. 85,498 (Dep't Commerce Oct. 28, 2024) ............................ 1, 6

*Frozen Warmwater Shrimp from Indonesia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 46,861 (Dep't Commerce May 30, 2024) ........................................... 4

*Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001) ........................................................ 16

*Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers From Malaysia*, 69 Fed. Reg. 20,592 (Dep't Commerce April 16, 2004) .............. 26

*Urea Ammonium Nitrate Solutions From the Republic of Trinidad and Tobago: Final Affirmative Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 37,824 (Dep't Commerce June 24, 2022) ...................................................................................................................................... 26

Plaintiff, the American Shrimp Processors Association ("ASPA" or "Plaintiff") submits the following memorandum in support of its motion for judgment on the agency record in the above-captioned action.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The American Shrimp Processors Association ("ASPA") seeks judicial review of certain aspects of the final affirmative antidumping duty ("AD") determination in the investigation of frozen warmwater shrimp from Indonesia. The final determination was published by Commerce in the Federal Register as *Frozen Warmwater Shrimp from Indonesia: Final Affirmative Determination of Sales at Less-Than-Fair Value,* 89 Fed. Reg. 85,498 (Dep't Commerce Oct. 28, 2024) ("*Final Determination*"). The findings and conclusions of the contested determination are set forth in the accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less-Than-Fair-Value of Frozen Warmwater Shrimp from Indonesia* (Dep't Commerce Oct. 21, 2024) ("*IDM*"), P.R. 338.[1]

### II.    Issues Presented for Review

1. Whether Commerce's reliance on the incomplete, inaccurate, and contradictory cost information reported by PT Bahari Makmur Sejati was not supported by substantial evidence and was otherwise contrary to law.

2. Whether Commerce's selection of surrogate financial records for the constructed value home market profit and expenses ratios, where less than one percent of the surrogate

---

[1] Citations to the public record documents are designated as "P.R." and citations to the confidential record documents containing business proprietary information are designated as "C.R."

1

company's sales were home market sales, was not supported by substantial evidence and was otherwise contrary to law.

## STANDARD OF REVIEW

This Court reviews final determinations issued by Commerce pursuant to 19 U.S.C. § 1673d to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence has been defined as "more than a mere scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The substantial evidence standard requires the Court to assess whether the administrative determination under review is reasonable given the record as a whole. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).

Commerce's determination is in accordance with law if it has met all constitutional, statutory, regulatory, and procedural requirements. *See Huvis Corp. v. United States*, 525 F. Supp. 2d 1370, 1374 (Ct. Int'l Trade 2007) *(citing FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003)).

## STATEMENT OF FACTS

### I.   History of the Case.

On October 25, 2023, ASPA filed a petition alleging that frozen warmwater shrimp from Indonesia was being sold in the United States at less than fair value and requesting an antidumping ("AD") investigation of such imports. Commerce initiated this investigation on November 21, 2023. *See Frozen Warmwater Shrimp from Ecuador and Indonesia: Initiation of*

2

*Less-Than-Fair-Value Investigations*, 88 Fed. Reg. 81,043 (Dep't Commerce Nov. 21, 2023) ("*Initiation*"). Commerce selected two mandatory respondents, PT Bahari Makmur Sejati ("BMS") and PT First Marine Seafoods/PT Khom Foods ("First Marine"). Commerce Memorandum, *Respondent Selection* (Nov. 29, 2023), P.R. 84.

On November 30, 2023, Commerce issued its initial questionnaires to both mandatory respondents. Commerce subsequently issued supplemental questionnaires.  ASPA submitted deficiency comments in response to the questionnaire responses submitted by BMS and First Marine. *See, e.g., Petitioner's Deficiency Comments, First Marine and BMS Section A Responses* (Jan. 10, 2024), P.R. 123; *Petitioner's Deficiency Comments, First Marine Section C Response* (Feb. 1, 2924), P.R. 139; *Petitioner's Additional Deficiency Comments, BMS Section C Response* (Mar. 29, 2024), P.R. 193.

In December 2023, mandatory respondents BMS and First Marine informed Commerce that they lacked viable home and third-country markets. *See* First Marine, *Notification Regarding PT. First Marine Seafoods Comparison Market Viability* (Dec. 6, 2023), P.R. 92; BMS, *Notification of No Viable Comparison Market Sales and Request for Questionnaire Modification* (Dec. 11, 2023), P.R. 94.

On February 7, 2024, Commerce issued a *Request for Constructed Value Profit and Selling Expense Comments and Information*. Dep't Commerce, *Request for Constructed Value Profit and Selling Expense Comments and Information* (Feb. 7, 2024) ("*CV Profit Request*"), P.R. 144. In response to this request, ASPA provided the publicly available 2022 financial statements of two Indonesian companies, PT Central Proteina Prima TBK ("CP Prima") and PT Japfa Comfeed Indonesia TBK ("Japfa"). *See* ASPA's *Submission of Financial Statements for Profit and Selling Expenses* (Mar. 1, 2024), P.R. 167. First Marine filed three financial

statements, for PT Panca Mitra Multiperdana Tbk ("PMMP"), PT Cilacap Samudera Fishing Industry Tbk ("CSFI"), and PT Dharma Samudera Fishing Industries Tbk ("DSFI"). *See* First Marine's *Comments on CV Proft and Selling Expenses* (Mar. 1, 2024), P.R. 163. BMS also proposed the financial statements of PMMP. *See* BMS's *Submission of Factual Information and Comments Concerning CV Profit and Selling Expenses* (Mar. 1, 2024), P.R. 162.

On March 8, 2024, ASPA submitted rebuttal comments to First Marine's and BMS's submissions. *See* ASPA, *Rebuttal to the Use of Financial Statements for Profit and Selling Expenses Proposed by Respondents* (Mar. 8, 2024), P.R. 176. First Marine also submitted rebuttal comments. *See* First Marine's *Rebuttal Comments on CV Profit and Selling Expenses* (Mar. 8, 2024), P.R. 178.

On May 30, 2024, Commerce published its preliminary affirmative determination that frozen warmwater shrimp from Indonesia were being sold in the United States at less than fair value, assigning a dumping margin of 6.3 percent to First Marine and All Others and a zero margin to BMS. *Frozen Warmwater Shrimp from Indonesia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 46,861 (Dep't Commerce May 30, 2024) and accompanying Preliminary Decision Memorandum (May 22, 2024) ("*PDM*"), P.R. 255. In its Preliminary Determination Memorandum, Commerce explained that it had selected the financial statements of CP Prima to determine profit and expense ratios for use with constructed values for BMS and First Marine. *PDM* at 14-15, P.R. 255.

Commerce verified the questionnaires filed by the mandatory respondents in Indonesia in June 2024. Commerce issued a verification report on the sales information reported by BMS on July 22, 2024. Dep't Commerce, *Verification of the Questionnaire Responses of PT Bahari*

*Makmur Sejati* (Jul. 22, 2024), P.R. 298. Commerce subsequently issued its verification reports on the sales information reported by First Marine, and the cost information reported by BMS and First Marine, between August 2, 2024 and September 9, 2024. *See* Dep't Commerce, *Verification of the Questionnaire Responses of PT First Marine Seafoods and PT Khom Foods* (Aug. 2, 2024), P.R. 303; Dep't Commerce, *Verification of the Cost Response of PT Bahari Makmur Sejati* (Aug. 6, 2024), P.R. 308; Dep't Commerce, *Verification of the Cost Response of PT First Marine Seafoods* (Sept. 9, 2024), P.R. 314.

On August 14, 2024, ASPA filed its case brief on sales issues. ASPA, *Petitioner's Sales Case Brief* (Aug. 14, 2024), P.R. 309. BMS submitted a rebuttal brief on August 19, 2024. BMS, *Rebuttal Brief – Sales* (Aug. 19, 2024), P.R. 312.

On September 16, 2024, ASPA submitted its case brief on cost issues. ASPA, *Petitioner's Case Brief and Request for Closed Hearing Session* (Sept. 16, 2024), P.R. 320. BMS, First Marine, and the Indonesian industry group the Indonesian Fishery Producers Processing and Marketing Association ("AP5I") also submitted case briefs on cost issues on September 16, 2024. *See* BMS, *Case Brief – Cost Issues* (Sept. 16, 2024), P.R. 316; First Marine, *Case Brief* (Sept. 16, 2024), P.R. 317; AP5I's *Initial Cost Brief* (Sept. 16, 2024), P.R. 318.

On September 23, 2024, ASPA submitted a rebuttal brief addressing the arguments raised in the cost issue case briefs submitted by BMS, First Marine, and AP5I. ASPA, *Petitioner's Rebuttal Brief* (Sept. 23, 2024), P.R. 323. Both mandatory respondents also submitted rebuttal briefs on cost issues. *See* BMS, *Rebuttal Brief – Cost Issues* (Sept. 23, 2024), P.R. 322; First Marine, *Rebuttal Brief of First Marine Seafoods and PT. Khom Foods* (Sept. 23, 2024), P.R. 321.

On October 28, 2024, Commerce made a final affirmative finding of sales at less than fair

value, assigning a dumping margin of 3.9 percent to First Marine and All Others and a zero

margin to BMS. *Frozen Warmwater Shrimp from Indonesia: Final Affirmative Determination of*

*Sales at Less-Than-Fair Value*, 89 Fed. Reg. 85,498, 85,499 (Dep't Commerce Oct. 28, 2024).

On December 26, 2024, Commerce issued its final antidumping duty order covering frozen

warmwater shrimp from Indonesia. *Frozen Warmwater Shrimp from Indonesia: Antidumping*

*Duty Order; Frozen Warmwater Shrimp From Ecuador, India, and the Socialist Republic of*

*Vietnam: Countervailing Duty Orders*, 89 Fed. Reg. 104,982 (Dep't Commerce Dec. 26, 2024).

ASPA filed its summons on January 23, 2025 and its complaint appealing certain aspects of

Commerce's final determination on February 21, 2025. Pl.'s Complaint (Feb. 21, 2025), ECF 8.


## II.     Additional Facts Relevant to the Cost Issue

### A.     How Shrimp Are Processed and Measured

Both mandatory respondents are shrimp processors.  As BMS explained:

> Raw shrimp typically arrives at BMS's processing facilities from
> unaffiliated farms or from middlemen vendors in whole, head-on form. The
> shrimp are washed and sorted by size using a sorting machine. Some manual
> sorting also takes place at this early stage of the production process. Quality
> control personnel check all incoming shrimp and conduct quality, microbial, and
> chemical checks, and physical inspection for size, weight, color, and defects.
> Whole shrimp are deheaded at processing tables staffed by workers who remove
> the shrimp heads by hand. After the heads are removed, the shrimp are washed a
> second time. Depending on the specification of the order for which the processing
> is taking place, the deheaded shrimp can be deveined, the shells can be removed,
> or the tails can be removed. The shrimp are washed after every processing step. In
> addition, if necessary, the shrimp are sorted by size at the completion of each
> major processing stage.
>
> Depending on the customer specifications or requirements, the deheaded,
> peeled and/or deveined shrimp can be soaked in a salt or chemical solution to
> ensure moisture retention. Raw shrimp are immediately frozen after processing.
> Cooked shrimp are steamed prior to freezing. Once the shrimp are processed to
> the specifications, quantities, and count sizes stated in the customer's order, the
> shrimp are individually quick-frozen ("IQF").

*BMS Sec. A Questionnaire Response* at A-23-24 (Dec. 28, 2023)*,* P.R. 112-114.

As described, the term "head-on" refers to the shrimp before processing.  It was abbreviated in BMS's documents as "HO" or "H/O." *See, e.g., BMS Section D Response* at D-26-27 and at Exhibit D-14 (Jan. 29, 2024) ("*BMS D*"), C.R. 110, P.R. 136.

Shrimp quantities are measured by count size.  The actual size is inversely correlated to the count size, as the count size is the quantity per a given weight measure, such as a pound or kilogram.  Commerce included count size as one of the physical characteristics incorporated in the control numbers (CONNUM) that respondents had to report for their sales and costs:

FIELD NAME: CNTSIZH/U

DESCRIPTION: Report the count size of the shrimp according to the basis upon which it sold. In the narrative, identify the count size ranges of this basis.

01 = 9 or less per pound
02 = 10 to 12 per pound
03 = 13 to 15 per pound
04 = 16 to 20 per pound
05 = 21 to 25 per pound
06 = 26 to 30 per pound
07 = 31 to 35 per pound
08 = 36 to 40 per pound
09 = 41 to 50 per pound
10 = 51 to 60 per pound
11 = 61 to 70 per pound
12 = 71 to 80 per pound
13 = 81 to 90 per pound
14 = 91 to 110 per pound
15 = 111 to 130 per pound
16 = 131 to 150 per pound
17 = 151 to 200 per pound
18 = 201 to 300 per pound
19 = 301 to 500 per pound
20 = greater than 500 per pound

*Commerce Product Characteristics Memo* at 2-3 (Jan. 10, 2024), P.R. 122.

As Commerce explained when it solicited comments on the physical characteristics of subject shrimp, the information "will be used to identify the key physical characteristics of the

subject merchandise in order to report the relevant costs of production (COP)" and that the agency used these characteristics to identify "meaningful commercial differences among products." *Initiation*, 88 Fed. Reg. at 81044.

### B.    How BMS Reported its Costs.

BMS told Commerce that "{i}n the normal course of business, BMS does not maintain product-specific costs; nor does BMS calculate standard costs for the products it manufactures." *BMS D* at D-17, P.R. 136. BMS said that it "developed CONNUM-specific costs for the purposes of this response using the data in its financial systems and production records in order to comply with Commerce's reporting requirements." *Id.* at D-18.  BMS stated that it had "allocated the actual costs obtained from its financial accounting system to products based on the physical characteristics included in the Commerce's CONNUM hierarchy and on reasonable cost methodologies." *Id.* at D-20.

BMS began a description of its cost allocation by describing how it determined production quantities:

> In the normal course of business, BMS tracks production volume by the number of inner containers ("IC") produced, which typically are bags, but can also be inner boxes. Depending on the product produced, these ICs can have different net shrimp weights, which BMS records in various units of measurement (e.g., pounds, ounces, grams, kilograms). For purposes of calculating its reported costs of manufacture in this response, BMS first derived the net production quantities of each product during the POI by subtracting – on a product-specific basis – the quantities of products taken out from inventory for reprocessing from the quantities of products entering finished goods inventory. For example, if BMS produced 10 bags of Product A, and then subsequently took 4 bags of Product A from inventory for reprocessing into 4 bags of Product B, BMS overall produced 6 bags of Product A and 4 bags of Product B during the POI. BMS then converted all net production quantities of ICs into corresponding kilogram quantities. As described further below, BMS calculated costs for all products based on their total production weight in kilograms produced during the POI.

*BMS D* at D-25, P.R. 136.

In a subsequent questionnaire response, BMS provided additional explanation of its

treatment of reprocessed products:

> If a product underwent 9 production steps and entered FG inventory as Product A; and then later was withdrawn from inventory for one additional step of production into Product B, then BMS assigned costs to Product B as if it had undergone all 10 production steps – which, in fact, it did. As shown in the cost calculation worksheet in Exhibit D-14 (updated in Exhibit SC-29), BMS assigned full SHRIMP, DIRPACK, DIRMATOT, DIRLAB, VOH and FOH costs to all goods produced during the POI because BMS does not record whether the merchandise is produced directly from fresh shrimp material or is processed from previously produced merchandise.

> *BMS 2nd Supp. Sec. D* at SuppD2-4 (May 13, 2024) ("*BMS 2nd Supp.*"), P.R. 229.

BMS included a chart in the supplemental questionnaire that showed total production during the period of investigation ("POI") of [

] withdrawn from inventory for re-processing. *BMS 2nd Supp.* at Exhibit SD2-3, second page, C.R. 209. The removal of the products withdrawn for re-processing produces the POI production net of the inventory pulled for reprocessing but inclusive of the products that have been produced using the products from inventory, for a net POI production of [        ] kilograms of shrimp.

BMS explained how it determined the cost values that it reported to Commerce in its cost-of-production file:

> The main cost incurred in the production of subject merchandise is fresh shrimp, the cost of which depends primarily based on its count-size per kilogram. And it is the size of the finished shrimp product, together with its overall processing yield, that determines the count size of the shrimp input needed to produce the finished product. That is, to produce certain size finished shrimp products, BMS must use shrimp inputs of a correlated size based on the typical yield loss of the processes necessary to produce that output (e.g., de-heading, peeling, etc.). In its normal operations, BMS does not track the actual cost of the raw material shrimp inputs used in a particular output. While BMS purchases shrimp inputs according to size, the material costs are aggregated at the purchasing and receiving stages, and are not directly separable within the cost accounts to end products. For this reason, and for this investigation, BMS therefore developed a method by which it allocated shrimp raw material costs to different finished shrimp products in order to account for the cost differences

9

among products related to purchases of different-sized shrimp inputs. **Exhibit D-14** contains the worksheet that BMS used to assign its fresh shrimp purchase costs during the POI to finished products based on the form of the finished product, BMS's production yield experience, and the company's POI size-specific weighted average shrimp material unit purchase costs.

To calculate the product-specific shrimp material costs, BMS first compiled the net production quantity of each finished good output during the POI from its stock movement reports by product code. When producing a given finished shrimp product, BMS must use particular shrimp input sizes to yield the proper sized output products. The input sizes are based on processing yields according to head status, shell status, tail status, the type and degree of soaking in preservatives, cook status, and count size. Each combination of these physical characteristics results in a different total processing yield. . . In the cost calculation worksheet in **Exhibit D-14**, BMS assigned a final yield factor to each finished product based on its manufacturing experience. To determine the volume of raw shrimp material needed to produce each unique product, BMS then divided the POI total production quantity of each product by the yield factor necessary to produce the finished product.

The next step, as shown in **Exhibit D-14**, was for BMS to calculate the estimated raw shrimp material costs to produce each product during the POI. Again, using its production yields, BMS assigned starting shrimp raw material count sizes to each finished product produced. Using the POI weighted-average head-on shrimp costs from **Exhibit D-12**, BMS then assigned an original head-on shrimp material cost per kilogram to each finished product produced. BMS then multiplied the quantity of original shrimp material needed to produce the POI production volume of each finished product by the POI weighted-average purchase price for the head-on count size raw shrimp material needed to produce that product to derive the total estimated raw shrimp material costs for each finished shrimp product produced. BMS then divided its POI actual costs of [                    ] rupiah for all fresh shrimp material purchased by the total calculated shrimp material costs of [                    ] rupiah to calculate a variance, which BMS then applied to the estimated costs to derive the actual shrimp material costs to assign to each finished shrimp product. Finally, BMS added to the subtotal costs for each product an average cost for certain additional movement and insurance expenses to derive the total shrimp acquisition costs for each product.

*BMS D* at D-26-27, C.R. 110.

BMS explained that its labor costs varied depending on the size of the shrimp being

produced: "{d}ifferent products require different types of processing, and thus require different

amounts of labor inputs." *Id.* at D-29.

Thus, the cost information for BMS's products was determined as shown in Exhibits D-

12 and D-14 to its Section D questionnaire response (C.R. 110). Both of these exhibits identify the size of the shrimp being used for production. Exhibit D-12 identifies the sizes of the shrimp purchased in the column titled "Countsize per Kilogram," and D-14 identifies the size of shrimp used to produce a finished product in the column titled [          ].

As BMS explained, Exhibit D-12 identified its shrimp purchases during the POI, reporting by count size the quantity and average costs of its raw shrimp purchases during the POI. The average costs were then used in Exhibit D-14 to develop complete costs for each of BMS's POI products. The D-14 costs were aggregated by CONNUM to produce BMS's cost database, originally reported in Exhibit D-1 to its Section D questionnaire response.

The average price of a count size as shown in Exhibit D-12 was used to determine shrimp material costs for each product in Exhibit D-14 based on count size. BMS reported average POI prices for different count sizes of shrimp in Exhibit D-12 that ranged from [

                                                                      ].

In its case brief, ASPA compared the information reported by BMS in Exhibit D-12 to the information reported in Exhibit D-14. In Exhibit 1a to its case brief, ASPA summarized and compared by count size the POI purchased quantities of raw shrimp reported in Exhibit D-12 to the raw material input quantities reported as consumed to produce finished products in Exhibit D-14. The comparison showed that, in most cases, the [

          ]. They [                                        ]. ASPA,

*Petitioner's Cost Case Brief* at 2 (Sept. 16, 2024), C.R. 405. ASPA includes as the next page of this brief the information that appeared on the first page of its case brief exhibit.

11

PUBLIC VERSION

*Id.*, excerpt from Exhibit 1a, C.R. 405.

The D-12 count sizes in the exhibit are those for the sizes of the purchased raw shrimp; the D-14 count sizes are those of the raw materials that were input into BMS's production of finished products so that the comparisons are apples-to-apples. ASPA identified the issue raised by this exhibit:

> BMS is reporting count-size shrimp purchases in Exhibit D-12 that are [
>
>
>
>
>                                                                                              ].

*Petitioner's Cost Case Brief* at 3, C.R. 405.

In its case brief, ASPA noted that "{u}nder Commerce's cost reporting requirements, a respondent's costs must tie to its financial records" and that "whatever approach BMS took, it had to ensure that its reported input quantities and their costs tied to its financials." *Id.* at 7. Thus, the material costs that appeared in BMS's Exhibit D-12 totaling [

                                                                                              ]. [

                                                                                              ]. ASPA explained, however, that a respondent could reduce costs, and thus the extent of dumping, by manipulating the costs of its products and allocating costs away from certain products and over-reporting the costs to other products. *Id.* at 6-9. While the total costs would match, the manipulation of costs among different products would distort the dumping calculation and mask the full extent of dumping that had occurred.

13

In fact, this is what ASPA showed in Exhibit 1a and other exhibits to its case brief.  Thus, in the example discussed above, showing purchases of [



]. This means that BMS's cost reporting was not accurate. It shows the allocation of the costs of the [


].

BMS reported different raw material input sizes in Exhibit D-14 for the [

]. [                                                                                            ].  For example, the input count-sizes and yield ratios used for some of BMS's finished production are shown in the table below.

| | Exhibit D-14 finished product size | Exhibit D-14 identification of count-sizes of raw material inputs from Exhibit D-12 | Yield ratio associated with count sizes and finished products in Exhibit D-14 | Raw material price ranges for input count sizes from Exhibit D-12 (INR per kg) | |
|---|---|---|---|---|---|
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |

*BMS D* at Exhibit D-14, C.R. 110.

Thus, BMS reported different specific input count sizes and specific product yields for

the [                              ].  Despite this, in its rebuttal brief, BMS asserted that ASPA had

misunderstood its cost methodology.  BMS, *Rebuttal Brief – Cost Issues* at 1 (Sept. 23, 2024),

P.R. 322.  BMS said that "the head-on shrimp material sizes reported in Exhibit D-14 did not

represent the only size shrimp materials used to produce the finished products, but rather

represented the theoretical starting head-on shrimp material sizes, from which BMS could derive

starting standard costs for purposes of allocating its actual costs." *Id.* at 5.  Commerce explained

in its final IDM that it accepted BMS's explanations as reasonable:

> During the cost verification, BMS company officials explained that if BMS
> does not have sufficient raw shrimp of the ideal HO count size to produce their
> "target" count-size finished products, they may use other sizes to produce the
> target HO count-size finished product. In other words, the HO shrimp raw
> material input sizes that BMS associates with each finished product in Exhibit
> D-14 for reporting purposes are not the only sizes that could be consumed for
> the given product.
>
> *IDM* at 7, P.R. 338.

Thus, Commerce accepted BMS's explanation of the discrepancies between Exhibits D-

12 and D-14 as reasonable, despite the fact that BMS had allocated [

                                                                      ]

In its final decision memorandum, Commerce "did not find that there are any

inconsistencies between BMS's records and its reported costs which would warrant application

of total AFA," and so accepted BMS's cost reporting and found that BMS had not dumped

subject merchandise during the POI. *See IDM* at 6, P.R. 338.

### III.     Additional Facts Relevant to the Financial Ratios Issue

As noted above, ASPA provided the publicly available 2022 financial statements of two

Indonesian companies, CP Prima and Japfa, for the purposes of calculating profit and selling

expenses. *See* ASPA's Submission of *Financial Statements for Profit and Selling Expenses* (Mar.

1, 2024) ("*ASPA CV Submission*"), P.R. 167. Both of these companies produce merchandise identical to the subject merchandise (*i.e.*, frozen warmwater shrimp) and had predominantly domestic sales. *Id*. First Marine proposed three financial statements, one for PMMP, another for CSFI, and a third for DSFI. *See* First Marine's *Comments on CV Profit and Selling Expenses* (Mar. 1, 2024) ("*First Marine's CVP*"), P.R. 163. While PMMP is an Indonesian producer of frozen shrimp, the other two companies, CSFI and DSFI, are Indonesian producers of frozen *fish* and therefore produce only comparable, rather than identical merchandise. *See id*. BMS also proposed the financial statements of PMMP. *See* BMS's *Submission of Factual Information and Comments Concerning CV Profit and Selling Expenses* (Mar. 1, 2024), P.R. 162.

In ASPA's rebuttal comments to First Marine's and BMS's submissions, ASPA highlighted that the financial records submitted by both respondents were not suitable for use in determining constructed value. *See* ASPA, *Rebuttal to the Use of Financial Statements for Profit and Selling Expenses Proposed by Respondents* (Mar. 8, 2024) ("*ASPA CVP Rebuttal*"), P.R. 176. PMMP's financial records showed that less than one percent of PMMP's 2022 sales were home market sales, and over 73 percent of PMMP's exports were to the United States. *Id.* at 2-3. As a result, PMMP's financial records would not provide a reasonable estimate of a domestic profit rate or domestic selling expenses, particularly since Commerce has recognized in the past that "it does not want to construct a normal value based on financial data that contains exclusively or predominantly U.S. sales." *Id*. (citing *Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium From Israel*, 66 Fed. Reg. 49,349 (Dep't Commerce Sept. 27, 2001) and accompanying Issues and Decision Memorandum ("*Pure Magnesium from Israel* IDM") at Comment 8).

Additionally, the other two companies proposed, CSFI and DSFI, produced comparable

16

but not identical products and, respectively, engaged in completely unrelated industries and had significantly different business operations, which made these financial statements unsuitable as bases for constructed value. *Id.* at 3-4. First Marine also submitted rebuttal comments, to place information on the record that Japfa had business interests other than frozen warmwater shrimp. *See* First Marine's *Rebuttal Comments on CV Profit and Selling Expenses* (Mar. 8, 2024), P.R. 179.

In its preliminary determination, Commerce selected CP Prima's financial statements as the surrogate information to calculate constructed value profit and expense ratios. *PDM* at 14-15, P.R. 255. In subsequent case briefs, First Marine and Indonesian industry group the Indonesian Fishery Producers Processing and Marketing Association ("AP5I") argued that the CP Prima financial statements were not suitable as a basis for Commerce's constructed value profit and selling expense ratios and requested that Commerce use one or more of the financial statements proposed by First Marine. *See* First Marine, *Case Brief*, P.R. 317; AP5I's *Initial Cost Brief*, P.R. 318.

In its rebuttal brief, ASPA explained that the 2022 financial statements of PMMP were not a suitable basis for Commerce's constructed value profit and selling expenses since domestic sales made up only 0.33 percent of its net 2022 sales, and only 0.54 percent of its U.S. sales, far less than the five percent or more of U.S. which Commerce's regulations at 19 C.F.R. § 351.404(b)(2) require for a respondent's domestic or third country sales to be viable for use to determine normal values. ASPA, *Petitioner's Rebuttal Brief*, P.R. 323. As PMMP's domestic sales would not be viable if it were a respondent, its domestic sales are also insufficient as a basis for constructed value ratio calculations. *Id.* ASPA requested that, in the alternative, Commerce should use the financial statements of Japfa. *Id.*

In its final determination, Commerce reversed course and relied on the surrogate financial statements of PMMP, rather than CP Prima, to calculate constructed value profit and selling expenses. *IDM* at 28-29, P.R. 338. Commerce explained that it decided CP Prima was not the best information on the record because, while CP Prima's overall financial statements showed a profit for 2022, CP Prima's seafoods product segment operated at a loss. *Id.* at 28. In selecting PMMP's financial statements as the source for profit and selling expenses for the final determination, Commerce acknowledged that it had found PMMP's financial statements unsuitable in the preliminary determination because "the majority of the company's sales were to the United States." *Id*. Commerce did not, however, explain why the existence of a small amount of "domestic sales which incurred a profit" was sufficient to reverse this preliminary finding of unsuitability in the final determination. *Id.*

## SUMMARY OF ARGUMENT

ASPA challenges two aspects of the constructed values used by Commerce to determine dumping: (1) the costs reported by the respondent BMS used to determine material, processing, and overhead costs; and (2) the financial ratios Commerce used to determine expenses and profit.

In the proceeding below, ASPA demonstrated that facts of record showed that the raw shrimp acquisition costs reported by BMS were not accurately allocated to the costs reported for each CONNUM of shrimp produced by BMS. BMS allocated different material and labor costs to different products for its cost reporting based on count size, yet the company admitted that the count sizes it reported were not accurate. Commerce's reliance on those mis-reported costs to determine dumping was not supported by substantial evidence. In addition, BMS's costs did not conform to the statutory requirement that constructed values include the cost of materials used to produce its merchandise, and so Commerce's reliance on those costs was contrary to law.

18

Commerce relied on profit and selling expense ratios to determine constructed values based on the financial statement of PMMP, an Indonesian producer that had an extremely small volume of domestic sales and a very large volume of U.S. sales.  In so doing, Commerce deviated from its consistent practice of not relying on surrogate financial data from companies with predominantly U.S. sales, and it did so without explanation.  Moreover, the volume of PMMP's domestic sales was so small that, if the producer had been selected as a mandatory respondent, Commerce would not have relied on its domestic sales for normal values.  Consequently, Commerce's use of the producer's information for constructed values was not supported by substantial evidence.

ASPA asks this Court to remand this action to Commerce for reconsideration of: (1) its reliance on BMS's reported costs; and (2) its reliance on PMMP's financial information to determine profit and selling expenses for constructed values.

## **ARGUMENT**

### I.    **Commerce's Reliance on BMS's Cost Reporting Was Not Supported by Substantial Evidence and Otherwise Contrary to Law**

As reviewed above, ASPA demonstrated that BMS's POI raw shrimp material costs as reported in Exhibit D-12 were inconsistent with its calculation of product costs in Exhibit D-14.  Commerce disagreed that the differences that ASPA identified indicated that BMS had misreported its cost. *See IDM* at 6, P.R. 338.  Commerce further held that there were no inconsistencies between BMS's records and its reported costs that would warrant the use of adverse facts available for those costs.  *Id.*

Commerce provides its rationale for these conclusions in its memorandum.  It begins its justification by quoting at length from one of BMS's responses explaining that the count sizes of raw material inputs were different from the count sizes of its finished products.  *Id.*  This is

19

accurate, but not relevant to the issues raised by ASPA.  Commerce demonstrates that it understood this in the sentence following its quote from BMS: "{t}he petitioner alleges that BMS's material costs are unreliable due to a mismatch between the quantities of raw shrimp purchased per count size, from Exhibit D-12, and the quantities of those count sizes consumed as reflected in the cost allocation worksheets."  *Id.*  As Commerce has recognized, ASPA compared the count-sizes of the purchased shrimp in Exhibit D-12 to the sizes of raw material inputs identified in Exhibit D-14, so it was comparing identical measures.

In its cost verification report, Commerce said that "BMS assigns its fresh shrimp purchase costs during the POI to finished products based on the form of the finished product, BMS's production yield experience, and the company's POI size-specific weighted-average shrimp material unit purchase costs."  *Commerce Cost Verification Report* at 12 (Aug. 6, 2024), P.R. 308.  Commerce found that "the HO shrimp raw material input sizes that BMS associates with each finished product in Exhibit D-14 for reporting purposes are not the only sizes that could be consumed for the given product."  *IDM* at 7, P.R. 338.

As is reviewed above, BMS, in fact, did report different input raw material count sizes for the [                    ] in Exhibit D-14.  This meant that different costs were allocated to its products depending on the raw material inputs identified in Exhibit D-14.

BMS urged Commerce to accept that it reported the consumption of different-sized raw material inputs for the production of the same-sized products, but the company did not actually report them accurately. Yet Commerce relied on those costs.

Commerce concludes its final decision memorandum by identifying the different cost elements that it confirmed during verification.  *IDM* at 7, second paragraph, P.R. 338.  Each of the elements reviewed was in and of itself accurate, but their accuracy does not explain the

demonstrated mismatches in [              ].  Specifically, one can (as Commerce reported) determine the costs of individual raw material purchases; one can review invoices and determine that the purchase price of a particular size of shrimp reported in Exhibit D-12 is accurate, that the price reported for a particular sized input in Exhibit D-12 is the same as the price reported for that input in Exhibit D-14, and that the yield rate for raw material inputs in the production of finished products as shown in Exhibit D-14 is accurate.  All of these can be accepted as accurate without determining that the total POI purchased quantities for particular raw material sizes as shown in Exhibit D-12 are consistent with POI consumption of those sizes for production as shown in Exhibit D-14.

In essence, Commerce has accepted as reasonable cost reporting a respondent's elaborate cost allocation file involving the reporting of different costs for different-size raw material inputs in Exhibit D-12 and the assignment of different-sized inputs with different [

                  ] products in Exhibit D-14 when, in fact, the respondent itself admitted that its reporting is not accurate.  Commerce's acceptance of BMS's cost reporting is not supported by substantial evidence.  Commerce should not have accepted as accurate an elaborate cost allocation structure that BMS itself has stated is not accurate.

A determination by Commerce "is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (*citing  Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  No reasonable mind would accept as meeting substantial evidence requirements a respondent's cost reporting that the respondent itself admits is not in fact accurate.

As is demonstrated, there is no logical connection between the facts of record and Commerce's conclusion. Commerce must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Tianjin Magnesium Int'l Co. v. United States*, 34 CIT 980, 982, 722 F. Supp. 2d 1322, 1328 (2010) (*quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Commerce did not articulate any satisfactory explanation for its decision to accept BMS's admittedly inaccurate cost reporting.

The statute requires that constructed value include "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise." 19 U.S.C. § 1677b(e)(1). The record in the proceeding below makes it clear that BMS manipulated its costs such that Commerce could not reasonably have concluded that the costs that BMS reported for its individual products represented the costs that it actually incurred to produce those products. To be in accordance with law, Commerce's actions must be "reasonable under the terms of the relevant statute." *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 24 C.I.T. 485, 488, 102 F. Supp. 2d 486, 489 (2000). As this Court has noted, "properly allocating costs to the production of the subject merchandise is essential to the accurate calculation of the constructed value of the goods." *Ellwood City Forge Co. v. United States*, 654 F.Supp.3d 1268, 1273 (Ct. Int'l Trade, 2023). In addition, "reliable and complete cost information is necessary for Commerce to 'calculate constructed value{,} .. establish a basis for comparison to U.S. price,' and, ultimately, calculate an accurate dumping margin." *Pro-Team Coil Nail Enterprise, Inc. v. United States,* 483 F.Supp. 3d 1242, 1249 (Ct. Int'l Trade, 2020), *quoting Pro-Team Coil Nail Enterprise, Inc. v. United States,* 419 F.Supp. 3d 1319,1339 (Ct. Int'l Trade, 2019).

22

By relying on inaccurate constructed values to determine dumping, Commerce has acted

contrary to the law requiring constructed value to include the cost of materials and fabrication or

other processing of any kind employed in producing the merchandise.  19 U.S.C. § 1677b(e)(1).

Thus, the facts on the record do not provide substantial evidence for Commerce's

reliance on BMS's cost reporting as accurate or even that its cost reporting met the requirements

of the statute.  This Court should remand this action to Commerce with instructions to reconsider

the record as a whole, including the evidence identified by Petitioner in its case brief, that

significantly detracted from Commerce's decision to accept BMS's cost reporting as accurate.

*See Nippon Steel Com. v. United States*, 337 F.3d at 1379 (Fed. Cir. 2003) (*citing Atl. Sugar, Ltd,*

*v. United States.* 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

## II.    Commerce's Selection of PMMP's Financial Statement for Constructed Value Profit and Selling Expenses Was Unsupported by Substantial Evidence and Contrary to Law

### A.    Commerce Deviated without Explanation from its Practice of Relying on Producers that Had the Majority of their Sales in the Home Market for Surrogate Profit and Selling Expenses.

When Commerce determines that it is not able to rely on actual prices for use as normal

values, Commerce may rely on constructed value. 19 U.S.C. § 1677b(a)(4). Constructed values

have two elements: (1) the cost of materials and fabrication or other processing; and (2) selling,

general, and administrative expenses, and profit. 19 U.S.C. § 1677b(e).  For the latter, Commerce

is to rely on "the actual amounts incurred and realized by the specific exporter or producer being

examined … for selling, general, and administrative expenses, and for profit, in connection with"

their home market sales of the subject merchandise. 19 U.S.C. § 1677b(e)(2)(A); *SKF USA Inc.*

*v. United States*, 263 F.3d 1369, 1374 (Fed. Cir. 2001) ("*SKF USA*") (identifying this as the

"preferred methodology"). If actual respondent amounts are not available for the latter, the

statute authorizes the use of three alternative methodologies, without "a hierarchy or preference" between them. *SKF USA*, 263 F.3d at 1374.

One of these three alternative methodologies is to use "the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method." 19 U.S.C. § 1677b(e)(2)(B)(iii). There is no statutory benchmark for what makes a method "reasonable." Instead, the Statement of Administrative Action ("SAA") for the Uruguay Round Agreements Act explained that, in applying this methodology, "Commerce will determine on a case-by-case basis the profits 'normally realized' by other companies on merchandise of the same general category." H.R. Doc. 103–316 at 841 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4176.

In this case, there were 2022 financial statements for five Indonesian companies on the record of the investigation for potential use to determine expenses and profit. Three of these proposed companies produced identical merchandise (*i.e.,* frozen shrimp) and the other two produced comparable, but not identical, merchandise (*i.e.*, frozen fish). Of the three companies that produced identical merchandise, two – CP Prima and Japfa – had significant domestic sales, of eighty-eight percent or higher. *See ASPA CV Submission* at 4-5, P.R. 167. However, the third company that produced frozen shrimp, PMMP, made less than one percent of its 2022 sales domestically, and the majority (73.6 percent) of its sales were exports to the United States. *See ASPA CVP Rebuttal* at 2-3, P.R. 176.

Commerce relied on the financial statements of CP Prima in its preliminary determination, noting that "{t}his information meets our criteria in that it is contemporaneous, represents Indonesian producers of identical merchandise and, thus, it is reflective of business operations and products similar to the respondents under investigation), and it appears to

*predominantly reflect sales (and thus profits) in the Indonesian market*." *PDM* at 15, P.R. 255
(emphasis added).

Commerce explained that it had preliminarily determined that all financial statements
except for CP Prima's were "unsuitable sources of CV profit" and, for PMMP, this was because
"the majority of the company's sales were to the United States." *IDM* at Comment 9, P.R. 338.
However, in its final determination, Commerce reversed course and found that PMMP's
financial statement *was* a suitable source for CV Profits since, "although its operations are
primarily export-oriented with most of the sales going to the United States, PMMP had domestic
sales which incurred a profit." *Id.* In making this determination, Commerce did not address the
fact that such "domestic sales" constituted a mere *0.33 percent* of PMMP's 2022 sales.
Additionally, while Commerce cited to the criteria of *Pure Magnesium from Israel*, Commerce
did not address how its reliance on PMMP's financial statements was consistent with its
explanation that Commerce "does not want to construct a normal value based on financial data
that contains exclusively or predominantly U.S. sales." *Pure Magnesium from Israel* IDM at
Comment 8.

While Commerce considers the application of a "reasonable method" under 19 U.S.C.
§ 1677b(e)(2)(B)(iii) on a case-by-case basis, Commerce's practice is to weigh several factors,
including: (1) "{t}he similarity between potential surrogate company's business operations and
products and the respondent's business operations and products"; (2) "{t}he extent to which a
potential surrogate company has sales in the United States and the respondent's home market";
(3) "{t}he contemporaneity of the surrogate data to the POI"; and (4) "{t}he similarity of the
customer base between a potential surrogate company and the respondent," such as retail
customers versus OEMs. *Certain Steel Nails From India: Preliminary Affirmative Determination*

*of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 47,719 (Dep't Commerce Aug. 4, 2022) and accompanying Preliminary Decision Memorandum ("*Steel Nails from India* PDM") at 13-14; *see also Pure Magnesium from Israel* IDM at Comment 8; *Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers From Malaysia*, 69 Fed. Reg. 20,592 (Dep't Commerce April 16, 2004) and accompany Issues and Decision Memorandum ("*Television Receivers from Malaysia* IDM") at Comment 26.

Regarding the second factor – the extent of sales in the home market versus the United States – Commerce has long explained that "because {Commerce} is typically comparing U.S. sales to a normal value from the home market or third country, it does not want to construct a normal value based on financial data that contains exclusively or predominantly U.S. sales." *Pure Magnesium from Israel* IDM at Comment 8; *see also Television Receivers from Malaysia* IDM at Comment 26. In recent proceedings, Commerce has highlighted the importance of significant home market sales, and *not* having a significant quantity of U.S. sales, when selecting surrogate financial statements for constructed value. *Steel Nails from India* PDM at 14-15 ("the financial information of Indian producers of identical merchandise, with *significant domestic sales*, represents the best source available for CV profit" (emphasis added)); *Urea Ammonium Nitrate Solutions From the Republic of Trinidad and Tobago: Final Affirmative Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 37,824 (Dep't Commerce June 24, 2022) and accompanying Issues and Determination Memorandum ("*Nitrate Solutions from Trinidad and Tobago* IDM") at Comment 2 (highlighting that "neither {company} has a significant quantity of sales to the United States" when finding two companies' financial statements to be the "most informative data on the record").

By selecting a company with an extremely small quantity of domestic sales for its expense and profit calculations, Commerce deviated from its long-standing and consistent practice without explanation. Commerce abuses its discretion if "it departs from a consistent practice without a reasonable explanation." *Hyundai Steel Co. v. United States,* 745 F.Supp. 3d 1345, 1354 (Court Int'l Trade, Dec. 12, 2024), citing *Goodluck India Limited v. United States*, 11 F.4ᵗʰ 1335, 1342 (Fed. Cir. Aug. 31, 1021). As the Federal Circuit has also held, "Commerce must provide an explanation that is adequate to enable the court to determine whether its choices are actually reasonable, including as to calculation methods." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537 (Fed. Cir. 2019) (*citing CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367, 1376–77 (Fed. Cir. 2016)). Commerce did not explain how its reliance on PMMP's financial statements, as a reversal of its preliminary determination, in light of its prior practice and contrary to statutory intent, was reasonable, and its reliance on these financial statements was therefore unsupported by substantial evidence and contrary to law.

This Court should remand the action back to Commerce with instructions for it to explain its change of practice or reconsider its use of the financial statements of PMMP to calculate financial ratios for constructed values.

### B.    If PMMP Had Been a Respondent, Commerce Would Not Have Relied on its Home Market sales for Normal Values.

If PMMP had been selected as a mandatory respondent in Commerce's investigation into frozen warmwater shrimp from Indonesia, Commerce would not have used its home market sales as a basis for normal values. PMMP's financial statements for 2022 indicate that it made $140,427,073 in sales to the United States in 2022. *See First Marine's CVP* at Exhibit 2, P.R. 163. Subtracting PMMP's total export sales from its total net sales results in domestic sales of $636,789 in 2022. *See id.*; *see also ASPA CVP Rebuttal* at 3, fn. 5, P.R. 176. Therefore, the value

27

of PMMP's domestic sales was only 0.45 percent of the value of its U.S. sales— *far* below the

five percent minimum threshold required to consider a respondent's home market to be viable

and thus a basis for normal value. *See* 19 U.S.C. § 1677b(a)(1)(C). Commerce would therefore

have been directed by statute to use third-country sales or constructed value as a basis for normal

value if PMMP had been a mandatory respondent. *See id.*; *see also* 19 U.S.C. § 1677b(a)(4) ("If

the administering authority determines that the normal value of the subject merchandise cannot

be determined under paragraph (1)(B)(i), then, notwithstanding paragraph (1)(B)(ii), the normal

value of the subject merchandise may be the constructed value of that merchandise").

It is not reasonable for Commerce to rely on financial statements for CV profits and

selling expenses where Commerce would find that company's sales to be "insufficient to permit

a proper comparison with the sales of the subject merchandise to the United States" if that

company was selected as a mandatory respondent in an investigation or administrative review.

19 U.S.C. § 1677b(a)(1)(C).

Commerce sought surrogate financial statements to calculate CV profit and selling

expenses because the two mandatory respondents, BMS and First Marine, lacked viable home or

third-country markets.  Thus, Commerce was unable to use the preferred method per Section

773(e)(2)(A) of the Act. *See, e.g.*, *PDM* at 14, P.R. 255; Dep't Commerce, *CV Profit Request*,

P.R. 144. Specifically, the sales of the foreign like product in home and third-country markets

were less than five percent of the volume of sales to the United States for both respondents. *See*

First Marine, *Notification Regarding PT. First Marine Seafoods Comparison Market Viability*,

P.R. 92 (*citing* Commerce's *Initial Questionnaire* at A-2); BMS, *Notification of No Viable*

*Comparison Market Sales and Request for Questionnaire Modification*, P.R. 94. While the

statute does not explicitly tie the availability of data for the preferred method to the "five

percent" market viability standard, the Federal Circuit has previously upheld Commerce's

determination to do so. *Mid Continent*, 941 F.3d at 538-39. It was therefore unreasonable for

Commerce to rely on surrogate financial statements from PMMP that suffered from the same

issue that rendered the selected mandatory respondents' actual data non-viable.

In *Mid Continent Steel & Wire, Inc. v. United States*, the Federal Circuit considered a

challenge to Commerce's determination not to use the "preferred method" for calculating

constructed value under Section 773(e)(2)(A). *See Mid Continent*, 941 F.3d at 536-537. In that

case, Commerce relied in part on Section 773(a)(1)(C) to find that the respondent lacked a viable

home or third-country market to base its constructed value profit and selling, general, and

administrative ("SG&A") expense calculations on "the actual amounts incurred and realized" on

sales "in the ordinary course of trade" per Section 773(e)(2)(A). *See id.* at 538. The respondent

argued that "the specified home-country sales data is 'available,' and therefore must be used, no

matter how little of it there may be." *Id.* The Federal Circuit rejected this argument, finding that

"the statute does not exclude Commerce's practical, function-based understanding of 'available,'

as applied to the data identified in § 1677b(e)(2)(A)" and that "the statutory language allows

Commerce to consider whether the information suffices for use in making accurate

calculations—which may well depend on the volume of home-country sales and how that

volume affects the reliability of the information used for Commerce's accomplishment of its

assigned task." *Id.* at 539. The Federal Circuit also noted that "{o}n the purely legal question of

ambiguity in the statute … we may consider other relevant statutory provisions, helping us to

better understand the statutory terms at issue 'in their context and with a view to their place in

the overall statutory scheme.'" *Id.* at 539 (*citing Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93,

101 (2012)). In this case, the "five percent" market viability standard for normal values based on

PUBLIC VERSION

domestic or third party sales should inform the interpretation of the "reasonable method" under 19 U.S.C. § 1677b(e)(2)(B)(iii)

## <u>CONCLUSION</u>

As ASPA has demonstrated, Commerce has accepted the costs reported by the respondent BMS used to determine material, processing, and overhead costs despite BMS's admission that they were not accurate. Commerce has selected a company with minimal domestic sales for use to determine expenses and profit, contrary to its past practice and without explanation for its change and contrary to the guidance provided by the statute.

ASPA asks this Court to remand this action to Commerce for reconsideration of: (1) its reliance on BMS's reported costs; and (2) its reliance on PMMP's financial information to determine profit and selling expenses for constructed values.

Respectfully submitted,

/s/ William A. Fennell
Roger B. Schagrin
Elizabeth J. Drake
William A. Fennell
Alessandra A. Palazzolo
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel to American Shrimp Processors Association*

30

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief contains 9,368 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


Dated: September 2, 2025                                    /s/ William A. Fennell
                                                           William A. Fennell

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| AMERICAN SHRIMP PROCESSORS ASSOCIATION | |
| Plaintiff, | |
| v. | Ct. No. 25-00027 |
| UNITED STATES, | |
| Defendant, | |
| and | |
| PT BAHARI MAKMUR SEJATI, | |
| Defendant-Intervenor. | |

**<u>ORDER</u>**

Upon consideration of Plaintiff American Shrimp Processors Association's Rule 56.2 Motion for Judgment on the Agency Record and the accompanying memorandum, and upon all other papers filed and proceedings had herein, it is hereby

**ORDERED** that Plaintiff's motion is granted; and it is further

**ORDERED** that this action is remanded to the Department of Commerce to reconsider its finding that BMS's cost reporting was supported by substantial evidence and consistent with the law; and

**ORDERED** that on remand, the Department of Commerce will reconsider its

determination that the use of the financial statements of PT Panca Mitra Multiperdana Tbk to

calculate financial ratios for constructed values was supported by substantial evidence.


_____
TIMOTHY C. STANCEU, JUDGE

Dated: _____, 2025
        New York, New York