**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, ) ) ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 25-00027 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| PT BAHARI MAKMUR SEJATI, ) | |
| ) | |
| Defendant-Intervenor. ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

REBECCA T. MITCHELL
HEATHER HOLMAN                          Trial Attorney
Attorney                                         Commercial Litigation Branch
Office of the Chief Counsel                 Civil Division, U.S. Department of Justice
    for Trade Enforcement and Compliance    P.O. Box 480, Ben Franklin Station
U.S. Department of Commerce             Washington, D.C. 20044
Washington, D.C.                             (202) 616-0467

March 13, 2026                               Attorneys for Defendant

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Court No. 25-00027 |
| UNITED STATES, ) ) | |
| Defendant, ) ) | |
| PT BAHARI MAKMUR SEJATI, ) ) | |
| Defendant-Intervenor. ) ) | |

Upon consideration of the plaintiff's Rule 56.2 motion for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the plaintiff's Rule 56.2 motion for judgment on the agency record is denied; and it is further

ORDERED that judgment shall issue for the United States.

Dated: _____                    _____
          New York, New York                                          JUDGE

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT PURSUANT TO RULE 56.2 ........................................................................ 2

I.     Administrative Determination Under Review ................................................... 2

II.    Issues Presented for Review ............................................................................... 2

STATEMENT OF FACTS ................................................................................................... 2

SUMMARY OF ARGUMENT ............................................................................................ 6

ARGUMENT ....................................................................................................................... 6

I.     Standard of Review............................................................................................. 6

II.    Commerce's Use of BMS's Cost Reporting Is Supported by Substantial Evidence and in Accordance with Law ............................................................... 8

III.   Commerce's Selection of PMMP's Financial Statement for Constructed Value Profit and Selling Expenses Is Supported by Substantial Evidence and in Accordance with Law ... 13

        A.    Legal Standard for Selecting Surrogate Financial Statements for Constructed Value ............................................................................. 13

        B.    Commerce's Determination that PMMP's Financial Statements Are the Best Source Available for Calculating Constructed Value Profit Is Supported by Substantial Evidence and in Accordance with Law ............................................... 15

CONCLUSION.................................................................................................................... 21

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashley Furniture Indus., LLC v. United States*,
　　607 F. Supp. 3d 1210 (2022) ......................................................................... 18, 21

*Atl. Sugar, Ltd. v. United States*,
　　744 F.2d 1556 (Fed. Cir. 1984) ............................................................................. 7

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
　　5 F.4th 1367 (Fed. Cir. 2021) ................................................................................ 7

*Cleo Inc. v. United States*,
　　501 F.3d 1291 (Fed. Cir. 2007) ............................................................................. 7

*Coal. of Am. Millwork Producers v. United* States,
　　581 F. Supp. 3d 1295 (Ct. Int'l Trade 2022) ......................................................... 8

*Consolo v. Fed. Mar. Comm'n*,
　　383 U.S. 607 (1966) ............................................................................................... 7

*CS Wind Malay. Sdn. Bhd. v. United States*,
　　803 F. Supp. 3d 1330 (Ct. Int'l Trade 2025) ....................................................... 21

*Dongkuk S&C Co. v. United States*,
　　134 F.4th 1320 (Fed. Cir. 2025) .......................................................................... 21

*Fujitsu Gen. Ltd. v. United States*,
　　88 F.3d 1034 (Fed. Cir. 1996) ............................................................................... 6

*Goodluck India Ltd. v. United States*,
　　11 F.4th 1335 (Fed. Cir. 2021). ........................................................................... 12

*INS v. Elias-Zacarias*,
　　502 U.S. 478 (1992) ............................................................................................... 7

*Maverick Tube Corp. v. United States*,
　　857 F. 3d 1353 (Fed. Cir. 2017) .......................................................................... 13

*Mid Continent Steel & Wire, Inc. v. United States*,
　　941 F.3d 530 (Fed. Cir. 2019) ....................................................................... 19, 20

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................................ 12

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ...................................................................................... 7

*PT. Zinus Glob. Indon. v. United States*,
  628 F. Supp. 3d 1252 (Ct. Int'l Trade 2023) ............................................................... 21

*Tianjin Magnesium Int'l Co v. United States*,
  722 F. Supp. 2d 1322 (Ct. Int'l Trade 2010) ............................................................... 12

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ........................................................................................................ 6

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ................................................................................................ 6

19 U.S.C. § 1677(35) ........................................................................................................ 13

19 U.S.C. § 1677b(a)(1)(A)-(C) ................................................................................. 13, 20

19 U.S.C. § 1677b(a)(1)(C) .............................................................................................. 19

19 U.S.C. § 1677b(a)(4) .............................................................................................. 14, 19

19 U.S.C. § 1677b(b)(3) ..................................................................................................... 8

19 U.S.C. § 1677b(e) ........................................................................................................ 14

19 U.S.C. § 1677b(e)(1)-(2)(A) ........................................................................................ 14

19 U.S.C. § 1677b(e)(2)(A) .............................................................................................. 20

19 U.S.C. § 1677b(e)(2)(B) ................................................................................... 15, 19, 20

19 U.S.C. § 1677b(e)(2)(B)(iii) .................................................................................. 15, 16

19 U.S.C. § 1677b(f)(1)(A)..................................................................................... 8, 12, 13

19 U.S.C. § 3512(d) ............................................................................................................ 8

**Other Authorities**

*Biodiesel from Indonesia*,
 83 Fed. Reg. 8,835 (Dep't of Commerce Mar. 1, 2018) (Final Determination) ...................... 17

*Certain Color Television Receivers from Malaysia*,
 69 Fed. Reg. 20,592 (Dep't of Commerce Apr. 16, 2004) (Final Determination) ................... 16

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
 74 Fed. Reg. 11,349 (Dep't of Commerce Mar. 17, 2009) (Final Results) ............................. 17

*Frozen Warmwater Shrimp from Ecuador and Indonesia*,
 88 Fed. Reg. 81,043 (Dep't of Commerce Nov. 21, 2023) (Initiation of Investigation) ........... 2

*Frozen Warmwater Shrimp from Indonesia*,
 89 Fed. Reg. 46,861 (Dep't of Commerce May 30, 2024) (Preliminary Determination) .......... 5

*Frozen Warmwater Shrimp from Indonesia*,
 89 Fed. Reg. 85,498 (Dep't of Commerce Oct. 28, 2024) (Final Determination) ............. 1, 2, 6

*Magnesium Metal from the Russian Federation*,
 76 Fed. Reg. 56,396 (Dep't of Commerce Sept. 13, 2011) (Final Results) ............................. 17

*Pure Magnesium from Israel*,
 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) (Final Determination) ................. 16

Statement of Administrative Action, H.R. Rep. No. 103-316 (1994),
 reprinted in 1994 U.S.C.C.A.N. 4040, 4172 (SAA) ........................................................ 8, 15

**Regulations**

19 C.F.R. § 351.404(b)(2) ............................................................................................. 14

iv

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Court No. 25-00027 |
| UNITED STATES, ) ) | |
| Defendant, ) ) | |
| PT BAHARI MAKMUR SEJATI, ) ) | |
| Defendant-Intervenor. ) ) | |

**DEFENDANT'S RESPONSE TO PLANTIFF'S**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motion for judgment on the agency record filed by plaintiff, American Shrimp Processors Association (ASPA).  *See* ASPA Br., ECF. Nos. 21 and 22.  ASPA challenges certain aspects of the United States Department of Commerce's final determination in the antidumping duty investigation of frozen warmwater shrimp (shrimp) from Indonesia.  *See Frozen Warmwater Shrimp from Indonesia*, 89 Fed. Reg. 85,498 (Dep't of Commerce Oct. 28, 2024) (Final Determination).  As demonstrated below, Commerce's determination is supported by substantial evidence and is in accordance with law.  Accordingly, we respectfully request that the Court deny ASPA's motion, sustain Commerce's determination, and enter judgment for the United States.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

**I.    <u>Administrative Determination Under Review</u>**

The administrative determination under review is Commerce's final determination of the antidumping duty investigation of shrimp from Indonesia.  *See Frozen Warmwater Shrimp from Indonesia*, 89 Fed. Reg. 85,498 (Dep't of Commerce Oct. 28, 2024) (Final Determination) (P.R. 351), and accompanying Issues and Decision Memorandum (IDM) (P.R. 338).  The period of investigation is October 1, 2022, through September 30, 2023.

**II.   <u>Issues Presented for Review</u>**

1.   Whether Commerce's reliance on PT Bahari Makmur Sejati (BMS)'s cost reporting is supported by substantial evidence and in accordance with law.

2.   Whether Commerce's use of PT Panca Mitra Multiperdana Tbk (PMMP)'s financial statements to calculate constructed value profit is supported by substantial evidence and in accordance with law.

<u>**STATEMENT OF FACTS**</u>

On October 25, 2023, Commerce received an antidumping duty petition from the ASPA concerning imports of shrimp from Indonesia.  *See generally* ASPA's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam," (Oct. 25, 2023) (P.R. 1, C.R. 1).  On November 14, 2023, Commerce initiated an investigation into whether frozen warmwater shrimp from Indonesia were being sold in the United States at less-than-fair-value.  *See generally Frozen Warmwater Shrimp from Ecuador and Indonesia*, 88 Fed. Reg. 81,043 (Dep't of Commerce Nov. 21, 2023) (Initiation of Investigation) (P.R. 77).  On November 29, 2023, Commerce selected PT Bahari Makmur Sejati (BMS) and PT First Marine Seafoods (First Marine) as the mandatory

respondents in the investigation.  Respondent Selection Memorandum at 1 (Nov. 29. 2023) (P.R. 84, C.R. 49).

On November 30, 2023, Commerce issued its initial questionnaire to both mandatory respondents.  *See generally* Commerce's Initial Questionnaire (Nov. 30, 2023) (P.R. 86, 88).  In Section D of its questionnaire, Commerce requested that respondents report cost of production information on a control number (CONNUM) specific basis.  *Id.* at D-1-2.  BMS timely responded to this questionnaire on January 29, 2024.  *See* BMS's Section D Response at 1 (Jan. 29, 2024) (P.R. 136, C.R. 110).  In its response, BMS explained that, in its ordinary course of business, it does not track the costs of raw material shrimp inputs—fresh shrimp or "head on"/"HO" shrimp—used in a particular output, and that it could not separate the costs of purchases to the corresponding end products as Commerce requested.  *Id.* at D-26.  To comply with Commerce's request, BMS instead reported its typical yield rate—how many finished products are produced from consumed raw shrimp, which it calculated based on its years of experience in this industry, and estimated the volume of shrimp input that it would need to produce a finished product.  *Id.* at D-26-27; *see also* BMS's Section D Response at Exhibit D-14 (Jan. 29, 2024) (C.R. 111).  Additionally, BMS reported its purchases of raw shrimp material in Exhibit D-12, and estimated count sizes, *i.e.* the number of shrimp that go into each kilogram of finished product, for each purchase to count sizes of final production, shown in Exhibit D-14. Response from BMS at D-27 (Jan. 29, 2024) (P.R. 136, C.R. 110); *see also* BMS's Section D Response at Exhibit D-12 and Exhibit D-14 (Jan 29, 2024) (C.R. 111).

Commerce requested clarification on BMS's cost reporting on April 26, 2024.  *See generally* Commerce's Supplemental Section D Questionnaire (April 26, 2024) (P.R. 216, C.R. 199).  Specifically, in Question 9 of its supplemental questionnaire, Commerce requested an

explanation of certain price discrepancies in Exhibit D-12, and certain inconsistencies between Exhibit D-12 and D-14. *Id.* at 6. In response, BMS clarified that the count sizes as reported in Exhibit D-12 show purchases of raw shrimp input, while the count sizes as reported in Exhibit D-14 show BMS's consumption of raw shrimp, which do not necessarily correlate given the degrees of processing that are undertaken to produce different finished frozen shrimp products. BMS's Supplemental Response at SuppD-8-10 (May 10, 2024) (P.R. 227, C.R. 203).

Additionally, in its initial questionnaire, Commerce requested constructed value (CV) information in the form of CONNUM-specific cost of product sold in the U.S. market. Initial Questionnaire at D-1 (Nov. 30, 2023) (P.R. 86, 88). In the course of the proceeding, the mandatory respondents each notified Commerce that they did not have a viable home market or third country market. *See* First Marine's Letter, "First Marine Seafoods Comparison Market Viability," (Dec. 6, 2023) (P.R. 93); BMS's Letter, "Notification of No Viable Comparison Market Sales and Request for Questionnaire Modification," (Dec. 11, 2023) (P.R. 94). On February 7, 2024, Commerce requested information from interested parties regarding CV profit and selling expenses. Commerce's Letter, "Request for Constructed Value Profit and Selling Expense Comments and Information," (Feb. 7, 2024) (P.R. 144). In response, ASPA provided financial statements of two Indonesian companies: PT Central Proteina Prima TBK (CP Prima) and PT Japfa Comfeed Indonesia TBK (Japfa). ASPA's Letter, "Submission of Financial Statements for Profit and Selling Expenses," and accompanying Exhibits (Mar. 1, 2024) (P.R. 167-70, C.R. 140-43). First Marine provided financial statements for three Indonesian companies: PT Panca Mitra Multiperdana Tbk (PMMP), PT Cilacap Samudera Fishing Industry Tbk (CFSI), and PT Dharma Samudera Finishing Industries Tbk (DSFI). First Marine's Letter, "Comments on CV Profit and Selling Expenses," and accompanying Exhibits (Mar. 1, 2024)

(P.R. 163-65).  BMS also submitted financial statements for PMMP.  BMS's Letter, "Financial Statements for Profit and Selling Expenses," (Mar. 1, 2024) (P.R. 162).

On May 30, 2024, Commerce published its preliminary affirmative determination that frozen warmwater shrimp from Indonesia were being sold in the United States at less-than-fair-value, calculating a preliminary dumping margin of zero for BMS, and 6.3 percent for First Marine and all other companies.  *Frozen Warmwater Shrimp from Indonesia*, 89 Fed. Reg. 46,861 (Dep't of Commerce May 30, 2024) (Preliminary Determination), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 255).  In its PDM, Commerce relied upon BMS's cost-of-production reporting, and chose CP Prima's financial statements to determine profit and expense ratios in its CV calculations.  *Id.* at 14-15.

Commerce officials verified BMS's cost response from June 3, 2024, through June 7, 2024.  Verification Report (Aug. 6, 2025) (P.R. 308, C.R. 398).  At verification, Commerce officials evaluated the accuracy of BMS's cost reporting and found no discrepancies between its reporting of costs and its records maintained from the purchase of raw material, through processing and accompanying yield rate, and final output.  *Id.* at 13.  Specifically, Commerce officials ensured that the quantity of raw shrimp consumed corresponded to the quantity of final products produced when accounting for the typical yield rate.  *Id.*

Commerce published its final determination on October 21, 2024.  *See generally* Final Determination (P.R. 351); IDM (P.R. 338).  In its Final Determination, Commerce continued to rely on BMS's cost reporting, IDM at 4-8 (Comment 1) (P.R. 338); however, Commerce relied on PMMP's surrogate financial statements for CV profit and expenses and discarded CP Prima's surrogate financial statements because CP Prima did not incur a profit over the period of investigation.  IDM at 23-30 (Comment 9) (P.R. 338).  Commerce made a final affirmative

finding of sales at less than fair value, assigning BMS a zero dumping margin and First Marine and all others a 3.9 percent dumping margin. *Frozen Warmwater Shrimp from Indonesia*, 89 Fed. Reg. 85,498, 85,499 (Dep't of Commerce Oct. 28, 2024) (Final Determination).

This action ensued.

## SUMMARY OF ARGUMENT

ASPA challenges two aspects of Commerce's decision. First, it argues that Commerce erred in relying on purportedly inconsistent cost reporting data in BMS's submissions. However, Commerce found no inconsistency in BMS's submissions and determined BMS adequately explained how it calculated its costs. Substantial evidence supports those findings.

Second, ASPA contends that Commerce erred in relying on PMMP's financial statements to determine constructed values. With this argument, ASPA essentially asks the Court to reweigh the imperfect financial statements available to Commerce and decide in the first instance whether one financial statement is better than the other.

Because the Court reviews Commerce's decision for substantial evidence and because the record supports Commerce's decision to select PMMP's financial statements, ASPA's attack must fail. Accordingly, this Court should deny ASPA's motion, sustain Commerce's determination, and enter judgment in favor of the United States.

## ARGUMENT

## I.    Standard of Review

The Court sustains any determination, finding, or conclusion by Commerce unless it is "'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies in applying its interpretation are

6

conclusive unless unsupported by substantial evidence.").  Substantial evidence is "'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Further, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion.  *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374 (Fed. Cir. 2021) (explaining that this "highly deferential review standard recognizes Commerce's special expertise in antidumping duty investigations," and that Federal Circuit affords "tremendous deference" to Commerce's administration of antidumping laws (quotation omitted)).  It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007).  A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quotation omitted).

## II.    Commerce's Use of BMS's Cost Reporting Is Supported by Substantial Evidence and in Accordance with Law

ASPA challenges Commerce's reliance on BMS's cost reporting, arguing that the quantity of fresh raw shrimp that BMS reported that it purchased is inconsistent with the quantity of raw shrimp that BMS reported that it consumed.  ASPA Br. at 19.

In an antidumping duty investigation, Commerce collects complete cost reporting information to establish constructed value.  19 U.S.C. § 1677b(b)(3).  Commerce is tasked with allocating a respondent's costs, "using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation." Statement of Administrative Action, H.R. Rep. No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4172 (SAA).[1]  Furthermore, Commerce shall calculate costs, "based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).  "Commerce has discretion over how the costs of production under 19 U.S.C. § 1677b(f)(1)(A) are to be calculated in an investigation or review."  *Coal. of Am. Millwork Producers v. United* States, 581 F. Supp. 3d 1295, 1314 (Ct. Int'l Trade 2022).

Commerce determined that the records provided by the producer, BMS, are reliable and reasonably reflect the costs of production.  IDM at 7 (P.R. 338).  ASPA's arguments to the contrary are unpersuasive.

---

[1]  In 19 U.S.C. § 3512(d), Congress adopts the SAA as "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements Act . . . in any judicial proceeding in which a question arises concerning such interpretation or application."

Commerce requested complete cost reporting information from BMS in Section D of its Initial Questionnaire, specifically requesting per-unit cost of production information for each control number (CONNUM). Commerce's Initial Questionnaire at D-1 (P.R. 86). In other words, Commerce requested the cost of raw shrimp material, or "head-on"/"HO" shrimp, for each finished package of subject merchandise. *Id.* However, BMS explained that, in its ordinary course of business, it does not track the cost of raw shrimp material that goes into a given size of finished shrimp product. BMS's Section D Response at D-26 (P.R. 136, C.R. 110). Rather, BMS purchases raw shrimp according to their size and weight. *Id.* Because one purchase of one size shrimp may be used for multiple finished products, Commerce could not rely on BMS's purchases for its input costs. *Id.*; BMS's Supplemental Questionnaire at SuppD-9 (P.R. 227, C.R. 203). For example, a purchase of "small" shrimp could be used for, among other things, final shrimp products of peeled, no tail, breaded, or seasoned shrimp. *See* BMS's Questionnaire Response at Exhibit D-14 (C.R. 111).

Because the quantity of BMS's purchases does not directly correlate to the quantity included in BMS's final products, BMS worked backwards to determine the quantities of actual consumed raw shrimp that go into each final product. BMS developed a "yield factor," which established the typical post-processing[2] weight of each shrimp by the final shrimp product produced. BMS's Section D Response at D-26 (P.R. 136, C.R. 110); Verification Report at 13 (P.R. 308, C.R. 398). This "yield factor" is an estimate based on BMS's *typical* rates that BMS ascertained from its more than twenty years of experience processing raw shrimp material into various types of frozen shrimp products. Verification Report at 13 (P.R. 308, C.R. 398). To

---

[2] The processing steps include de-heading, de-tailing, peeling, soaking, and cooking, amongst others. BMS's Supplemental Section D Response at SuppD-9 (P.R. 227, C.R. 203); Verification Report at 13 (P.R. 308, C.R. 398).

derive the volume of shrimp needed to produce each final product, BMS divided its total production quantity by the "yield factor."  BMS's Section D Response at D-27 (P.R. 136, C.R. 110).  Because the "yield factor" is an estimate, the consumed raw shrimp quantity is also an estimate.

To calculate an average cost, BMS then applied these estimated material quantities to BMS's actual purchases of shrimp raw material during the POI.  *Id.* at D-27; *see also* BMS's Section D Response at Exhibit D-14 (C.R. 111).  BMS then multiplied the average cost by the estimated quantity of raw shrimp material required for each finished shrimp product to determine the costs of raw shrimp material that go into each finished package.  BMS's Section D Response at D-28 (P.R. 136, C.R. 110).  Thus, although BMS did not track its purchases in the precise manner that Commerce requested in its initial questionnaire, Commerce reasonably found that BMS's method of reporting reasonably reflects BMS's cost of production of subject merchandise.

Although ASPA argues that BMS's reporting of product costs is unreliable because ASPA claims that BMS's reporting of material costs in Exhibit D-14 conflicts with its reporting of material costs in Exhibit D-12, ASPA Br. at 19, Commerce's decision to the contrary is supported by the record.  Commerce found that record evidence adequately explains the purported inconsistency between Exhibit D-14 and Exhibit D-12.  IDM at 7 (P.R. 338).  Exhibit D-12 shows the amount of raw shrimp material that BMS *purchased* during the POI, while Exhibit D-14 shows the amount of raw shrimp material that BMS *consumed* during the POI.  BMS's Section D Response at D-27-28 (P.R. 136, C.R. 110); BMS's Section D Response at Exhibits D-12 and D-14 (C.R. 111).

10

ASPA nevertheless complains that BMS's amount of purchased raw shrimp material by count size does not match the amount of raw material shrimp by count size input into each finished product.  ASPA Br. at 13, 20-21.  However, the record explains this difference.

BMS quality checks all of its purchases of raw HO shrimp.  Accordingly, if certain count-size shrimp purchased are "irregular or otherwise damaged," BMS reports them as a different count size in its inputs for its assigned costs to avoid representing an aberrational price.  BMS's Supplemental Section D Response at SuppD-8 (P.R. 227, C.R. 203).  Thus, if BMS received an imperfect product that it purchased under count size x, it may consume that product under count size y to better reflect the value of the product received.  *Id.* at SuppD-8-9.  Commerce considered this explanation, along with BMS's reporting, and found that BMS's reporting reasonably reflects BMS's cost of production.  IDM at 6 (P.R. 338).

ASPA does not address in its brief, nor did it address in the underlying proceedings, the fact that the shrimp count-sizes consumed, as shown in Exhibit D-14, are based on estimated standard allocations, while the shrimp purchased, as shown in Exhibit D-12, are based on actual purchases.  As explained, estimates are used because BMS does not track actual consumption by count-size in its normal books and records.  BMS's Section D Response at D-26.  Commerce reasonably concluded that estimated and actual values of consumed and purchased shrimp, respectively, would not be identical, and Commerce's acceptance of BMS's cost-reporting despite the mismatch is therefore lawful.

Contrary to ASPA's argument, ASPA Br. at 22, Commerce articulates a satisfactory explanation for its decision to accept BMS's cost reporting and "'articulate{s} a satisfactory explanation for its action including rational connection between the facts found and the choices made.'"  *Tianjin Magnesium Int'l Co v. United States*, 722 F. Supp. 2d 1322, 1328 (Ct. Int'l

Trade 2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In its IDM, Commerce provides a detailed explanation of BMS's cost reporting and addresses why Commerce determined that BMS's reporting reasonably reflects the cost of production. IDM at 5-7 (P.R. 338). The IDM explains that, because BMS does not have a cost accounting system, BMS used an alternative method to report costs. *Id.* at 5. It then describes the method that BMS used to calculate its costs. *Id.* at 5-6. Commerce addresses ASPA's argument that BMS misreported its costs and concludes that BMS's records do not actually contain the inconsistency that ASPA complains about. *Id.* at 6. Commerce goes though BMS's explanation of the difference between the numbers in Exhibit D-12 and Exhibit D-14 and finds that explanation satisfactory and reasonable. *Id.* at 6-7. In doing so, Commerce examines and verifies BMS's reported costs and traces BMS's calculations. *Id.* at 7. Therefore, Commerce's analysis forms a satisfactory explanation of the connection between the facts of BMS's cost reporting methodology and Commerce's choice to accept that reporting.

Although ASPA argues that BMS manipulated its evidence such that Commerce could not rely on BMS's reporting, ASPA Br. at 22, ASPA has provided no credible evidence of BMS's alleged manipulation. Commerce appropriately finds that BMS's cost reporting reasonably reflects the cost of production, and verified that the reporting is correct. 19 U.S.C. § 1677b(f)(1)(A); Verification Report at 11-13 (P.R. 308, C.R. 398).

"The purpose of verification is to test information provided by a party for accuracy and completeness." *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) (quotation omitted). During verification, BMS demonstrated its reporting methodology and how information maintained in the normal course of business supports its calculations. Verification Report at 11-12 (P.R. 308, C.R. 398). Specifically, Commerce traced the standard raw material

shrimp cost from Exhibit D-14 to the average price for the count size in Exhibit D-12 and found

that it was accurate.  *Id.*  At verification, Commerce therefore tested the evidence for accuracy

and reasonably relies upon it in its final determination.

Lastly, although ASPA contends that BMS "admitted" that its reporting is not accurate,

ASPA Br. at 18, 21-22, ASPA never provides a citation for this assertion.  Nor have we found

such an admission.  Instead, the record reflects that Commerce tested the completeness and

accuracy of BMS's cost reporting during verification, Commerce found no inaccuracy that would

have demonstrated that the reported numbers did not reasonably reflect the cost of production.

IDM at 7 (P.R. 338).

Commerce's determinations are "supported by substantial evidence if a reasonable mind

might accept the evidence as sufficient to support the finding." *Maverick Tube Corp. v. United

States*, 857 F. 3d 1353, 1359 (Fed. Cir. 2017).  Commerce appropriately exercised its discretion

under § 1677b(f)(1)(A) in evaluating BMS's reporting and determined that BMS's reporting

reasonably reflects costs associated with the production and sale of subject merchandise.

## III.    Commerce's Selection of PMMP's Financial Statement for Constructed Value Profit and Selling Expenses Is Supported by Substantial Evidence and in Accordance with Law

### A.    Legal Standard for Selecting Surrogate Financial Statements for Constructed Value

In calculating dumping margins, Commerce normally compares the export price or

constructed export price, *i.e.*, the price in the U.S. market, of the merchandise under investigation

to the normal value, *i.e.*, the price in the home market or a third-country market.  19 U.S.C.

§§ 1677(35), 1677b(a)(1)(A)-(C).  In other words, Commerce normally would compare the price

of shrimp in the United States to the price in Indonesia or a third country.  However, in this case,

Commerce determined that there was not a viable home or third market during the POI, because

the volume of home and third market sales of shrimp was less than five percent of the aggregate volume of U.S. sales of shrimp. IDM at 26 (P.R. 338); PDM at 11-12 (P.R. 255); 19 C.F.R. § 351.404(b)(2). In the absence of a viable home market or third-country market to determine the normal value, Commerce relied on constructed value to determine the normal value. IDM at 26 (P.R. 338); 19 U.S.C. § 1677b(a)(4).

As 19 U.S.C. § 1677b(e) instructs, Commerce calculates the "constructed value of imported merchandise" based on the sum of (1) "the cost of materials and fabrication or other processing in producing merchandise" and (2) "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative costs and profits in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(1)-(2)(A). Therefore, the statutorily preferred method is to use the producer's actual profits in connection with home market sales of the like product in the ordinary course of trade. *Id.*

If the preferred method is unavailable, the statute permits Commerce to calculate selling, general and administrative expenses, and profit under one of the following alternatives:

> (i)     the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii)    the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii)    the amounts incurred and realized for selling, general, and
administrative expenses, and for profits, based on any other
reasonable method, except that the amount allowed for profit may
not exceed the amount normally realized by exporters or producers
(other than the exporter or producer described in clause (i)) in
connection with the sale, for consumption in the foreign country, of
merchandise that is in the same general category of products as the
subject merchandise

19 U.S.C. § 1677b(e)(2)(B).

The statute does not establish a hierarchy for selecting among the alternatives for

calculating CV profit and expenses.  *See* SAA at 840 ("At the outset, it should be emphasized

that . . . new section {1677b}(e)(2)(B)} does not establish a hierarchy or preference among these

alternative methods.  Further, no one approach is necessarily appropriate for use in all cases.").

"{T}he selection of an alternative {is} made on a case-by-case basis, and will depend, to an

extent, on available data."  SAA at 840.

**B.    Commerce's Determination that PMMP's Financial Statements Are the Best
Source Available for Calculating Constructed Value Profit Is Supported by
Substantial Evidence and in Accordance with Law**

Because the record does not have information to use the preferred method for normal

value, Commerce determined the profit ratio pursuant to the alternative method under 19 U.S.C.

§ 1677b(e)(2)(B)(iii).[3]  IDM at 27 (P.R. 338).  A total of five financial statements are available on

the record for consideration:  CP Prima, CSFI, DSFI, Japfa, and PMMP.  *Id.* at 28.  To derive the

CV profit ratio for the mandatory respondents, Commerce selected the financial statements from

PMMP, an Indonesian producer of frozen shrimp.  *Id.* at 29-30.  ASPA challenges Commerce's

---

[3]  Commerce concluded that alternatives (i) and (ii) were unavailable because there is no
information in the record that would permit a calculation of profit and expenses specific to
respondents for products in the same general category as shrimp and because there were no
exporters or producers besides BMS and First Marine subject to this investigation.  IDM at 27
(P.R. 338).

selection of PMMP's financial statements, arguing that Commerce should have used CP Prima's statements. ASPA Br. at 23-30. As demonstrated below, Commerce's decision is supported by substantial evidence and is lawful pursuant to 19 U.S.C. § 1677b(e)(2)(B)(iii).

In determining which financial statements to select under 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce followed its long-standing practice of applying four criteria to evaluate financial statements: (1) the similarity of potential surrogate companies' business operations and products to the respondents'; (2) the extent to which the financial data of the surrogate company reflect sales in the home market and do not reflect sales to the United States; (3) the contemporaneity of the data to the POI; and (4) the extent to which the customer base of the surrogate company and the respondent are similar. IDM at 27 (P.R. 338) (*citing Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) (Final Determination), and accompanying IDM at Comment 8, and *Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Dep't of Commerce Apr. 16, 2004) (Final Determination), and accompanying IDM at Comment 26).

Commerce evaluated the five financial statements available in the record under each of these four criteria and decided that the financial statements of PMMP constituted the best source available for calculating the respondents' CV profit. IDM at 28. As the IDM explains, Commerce disregarded CSFI's and DSFI's financial statements because both companies did not produce merchandise identical to that produced by the respondents and instead primarily produced fish and were otherwise engaged in unrelated and non-similar industries. *Id.* at 28-29. Additionally, Commerce disregarded Japfa because it was primarily engaged in the livestock business, rather than in the production of subject shrimp. *Id.*

Although CP Prima is a producer of frozen shrimp, Commerce also disregarded CP

Prima's financial statements to construct CV profit in the final determination because CP Prima

did not make a profit on its sale of frozen shrimp. *Id.* at 28-29. Commerce's practice is to

disregard a company's financial statements to calculate profit when the company is not

profitable.[4]

Following the preliminary determination, First Marine and the Indonesian Fishery

Producers Processing and Marketing Association (AP5I) , an interested party, submitted

comments emphasizing that CP Prima's financial statements do not show profit in its production

of frozen shrimp. *Id.* at 28; First Marine's Comments on CV Profit (March 1, 2024) (P.R. 163);

AP5I's Cost Case Brief (September 16, 2024) (P.R. 319). Commerce observed that, although CP

Prima's overall financial statements show a profit, its seafood products segment, including the

production of shrimp products, incurred a loss. IDM at 28 (P.R. 338); ASPA's Letter,

"Submission of Financial Statements for Profit and Selling Expenses," (Mar. 1, 2024) at Exhibit

1 (C.R. 141, 142). Commerce explained that, in previous cases, it has found that when a

company is not profitable when it comes to merchandise comparable to the subject merchandise,

that company's financial statement's should not be used to calculate CV. IDM at 28 (P.R. 338)

(citing *Biodiesel from Indonesia*, 83 Fed. Reg. 8,835 (Dep't of Commerce Mar. 1, 2018) (Final

Determination), and accompanying IDM at Comment 5 (finding that potential surrogate financial

---

[4] *See Biodiesel from Indonesia*, 83 Fed. Reg. 8, 835 (March 1, 2018) (Final
Determination) and accompanying IDM at Comment 5; *Magnesium Metal from the Russian
Federation*, 76 Fed. Reg. 56, 396 (September 13, 2011) (Final Resolution), and accompanying
IDM at Comment 1.B; *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 74
Fed. Reg. 11, 349 (March 17, 2009), and accompanying IDM at Comment 1 (explaining
Commerce's preference to "use the financial statements of companies that have earned a profit
and disregard the financial statements of companies that have zero profit when there are other
financial statements that have earned positive profit on the record").

statements were not viable source for CV profit because company experienced loss in segment of operations related to subject merchandise)).  Thus, consistent with its practice, Commerce disregarded CP Prima's financial statements to construct CV profit in the final determination because CP Prima did not make a profit on its sale of merchandise identical to the subject merchandise.  *Id.* at 28-29.

Turning to PMMP, Commerce acknowledged that it did not use PMMP's financial statements during its preliminary determination because the majority of its sales were to the United States.  *Id.* at 28, 29.  In its final determination, however, Commerce concluded that PMMP's financial statements are the most suitable source on the record for calculating CV profit.  *Id.* at 29.  Commerce explains that PMMP produces identical merchandise to the subject merchandise and that its profit experiences and customer bases closely match those of the respondents.  *Id.*  Commerce further recognized that PMMP's financial statements are contemporaneous with the POI and that, although the majority of PMMP's sales are to the United States, PMMP does have domestic sales that incur a profit.  *Id.*  Weighing the foregoing information, Commerce elected to use PMMP's financial statements.

When "presented with multiple imperfect potential financial statements, Commerce is required to faithfully compare the strengths and weaknesses of each before deciding which to use."  *Ashley Furniture Indus., LLC v. United States*, 607 F. Supp. 3d 1210, 1221 (2022) (quotation omitted).  In this investigation, Commerce addressed the strengths and weaknesses of PMMP's and CP Prima's financial statements.  For CP Prima, Commerce identified its strengths: that it was an Indonesian producer of products identical to the subject merchandise and that its financial statements were complete, legible, and contemporaneous with the period of investigation.  IDM at 28 (P.R. 338).  Commerce also recognized the weaknesses of using CP

18

Prima's financial statements, namely that CP Prima's seafood products segment, including the production of identical shrimp products, was not profitable during the period of investigation, so was not an appropriate comparator to determine CV profit. *Id.*

Similarly, Commerce identified PMMP's strengths: that it produces the identical merchandise, that it was profitable and the customer bases and profit experience match those of the mandatory respondents, that there were domestic sales, and that the financial statements are contemporaneous with the period of investigation. *Id.* at 29. Commerce also recognized PMMP's financial statements' weakness: that most of its sales were to the United States. *Id.* After weighing the strengths and weaknesses of the different financial statements, none of which were perfect, Commerce determined that PMMP's financial statements presented the best option. *Id.*

ASPA's argument that Commerce would not have relied on PMMP's home market sales for normal value had PMMP been a respondent, ASPA Br. at 27-30, is misplaced. Commerce's authority to choose a financial statement to calculate *constructed value* profit is distinct from its authority to choose third country sales in determining *normal value*. *Compare* 19 U.S.C. § 1677b(e)(2)(B) *with* 19 U.S.C. § 1677b(a)(1)(C); *see also* 19 U.S.C. § 1677b(a)(4) (establishing that Commerce must use 1677b(e) to determine constructed value, and that no further analysis under 1677b(a) is required). PMMP was not a mandatory respondent in this proceeding, so evaluating its hypothetical compliance with 19 U.S.C. § 1677b(a)(1)(C) is inappropriate.

Although ASPA relies on a *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019), ASPA 34-35, that decision does not support ASPA's argument. In *Mid Continent*, Commerce decided not to use the preferred method for calculating constructed value

because the volume of sales identified was insignificant. 941 F.3d at 538. In that case, when determining that using the preferred method was not appropriate, Commerce relied in part of 19 U.S.C. § 1677b(a)(1)(C), which permits Commerce to rely on third-country sales if home-country sales are "insufficient to permit a proper comparison," and provides that home-country sales are insufficient when they constitute less than five percent of sales to the United States. *Id.* The plaintiff argued that Commerce erred in rejecting the preferred method on that basis. *Id.* The Federal Circuit stated, "Although we *do not think that the five-percent standard applies here*, we conclude that the statute does not exclude Commerce's practical, function-based understanding of 'available,' as applied to the data identified in § 1677b(e)(2)(A)." *Id.* (emphasis added).

In other words, *Mid Continent* does not, as ASPA claims, stand for the proposition that "{i}t {is} unreasonable for Commerce to rely on surrogate financial statements . . . that suffer{} from the same issue that rendered the selected mandatory respondents' actual data non-viable." ASPA Br. at 35. Nor does it stand for the proposition that Commerce must use the "'five percent' market viability standard for normal values" when evaluating financial statements under 19 U.S.C. § 1677b(e)(2)(A), let alone § 1677b(e)(2)(B). Rather, that case posits that the statute, "allows Commerce to consider whether the information suffices for use in making accurate calculations." *Mid Continent*, 941 F.3d at 538. Commerce's lawful exercise of its discretion in *Mid Continent* does not mandate that Commerce must perform the exact same analysis in every case. Indeed, the Court in *Mid Continent* upheld Commerce's analysis notwithstanding its erroneous reliance on § 1677b(a)(1)(C). *Id.* Accordingly, ASPA's reliance on *Mid Continent* is unpersuasive.

"In selecting between potential constructed value surrogates, it is within 'Commerce's purview to decide which imperfect sources of data to use.'" *CS Wind Malay. Sdn. Bhd. v. United States*, 803 F. Supp. 3d 1330, 1341 (Ct. Int'l Trade 2025) (ellipses omitted) (quoting *Dongkuk S&C Co. v. United States*, 134 F.4th 1320, 1331 (Fed. Cir. 2025)). Therefore, Commerce evaluated each of its articulated factors and addressed the strengths and weaknesses of the imperfect financial statements of PMMP and CP Prima. *Ashley Furniture*, 607 F. Supp 3d. at 1221. After doing so, Commerce appropriately exercised its discretion by weighing the evidence and determining that PMMP's financial statements are the best available on the record and using them to calculate CV profit. *See PT. Zinus Glob. Indon. v. United States*, 628 F. Supp. 3d 1252, 1271 (Ct. Int'l Trade 2023) ("The language of the statute provides Commerce with discretion to weigh the individual factors and to identify the best available information."). As a result, Commerce's decision to use PMMP's financial statements over those of CP Prima to calculate CV profit is supported by substantial evidence on the record and in accordance with law.

## CONCLUSION

For these reasons, we respectfully request that the Court deny ASPA's motion for judgment on the agency record and enter judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                     /s/Rebecca T. Mitchell
HEATHER HOLMAN                          REBECCA T. MITCHELL
Attorney                                            Trial Attorney
Office of the Chief Counsel                U.S. Department of Justice
      for Trade Enforcement and Compliance     Civil Division
U.S. Department of Commerce           Commercial Litigation Branch
Washington, D.C.                              P.O. Box 480
                                                       Ben Franklin Station
                                                       Washington, D.C. 20044
                                                       Telephone: (202) 616-0467
                                                       E-mail: Rebecca.Mitchell@usdoj.gov

March 13, 2026                               *Attorneys for Defendant*

### **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(b)(1) of the Standard Chambers Procedures of this Court, that this brief contains 6,049 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Rebecca T. Mitchell
REBECCA T. MITCHELL