UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>        Plaintiff,<br>v.<br><br>UNITED STATES,<br><br>        Defendant,<br>and<br><br>PT Bahari Makmur Sejati,<br><br>        Defendant-Intervenor. | Court No. 25-00027<br><br>**PUBLIC VERSION**<br><br>Business Proprietary Information Identified by Single Brackets [ ] Has Been Redacted |

**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF ASPA'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to PT Bahari Makmur Sejati

Dated:  March 13, 2026

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ........................................................................................ ii

I.      STATEMENT PURSUANT TO RULE 56.2(c) ............................................. 1

II.     ISSUE OF LAW PRESENTED ..................................................................... 1

III.    SUMMARY OF ARGUMENT ...................................................................... 2

IV.     ARGUMENT ................................................................................................. 3

      A.      BMS Accurately Reported the Shrimp Material Portion of Its Costs of
            Manufacture and Commerce Reasonably Relied Upon Those Costs ................... 3

            1.      Plaintiff ASPA's Arguments Are Based on a Misunderstanding of BMS's
                  Cost Reporting Methodology ........................................................................ 3

            2.      BMS Did Not Report Contradictory Shrimp Material Input Sizes ............. 10

      B.      Commerce's Calculation of BMS's Constructed Value Profit and Selling
            Expenses Was Supported by Substantial Evidence and Lawful .......................... 11

            1.      Commerce's Reliance on the PMMP Data Was Reasonable ....................... 11

            2.      Arguments Related to Market Viability Are Not Relevant .......................... 22

V.      CONCLUSION .............................................................................................. 24

CERTIFICATE OF COMPLIANCE

## <u>TABLE OF AUTHORITIES</u>

<u>Statutes</u>                                                                                    <u>Page</u>

19 U.S.C. § 1677(35) ...............................................................................12

19 U.S.C. § 1677b(a)(1)......................................................................12, 22

19 U.S.C. § 1677b(a)(4) .........................................................................12

19 U.S.C. § 1677b(e) ............................................................13, 14, 20, 21, 22, 23, 24

19 U.S.C. § 3512(d) ...............................................................................12

<u>Regulations</u>

19 C.F.R. § 351.404 ................................................................................23

<u>Cases</u>

*Dongkuk v. United States*, 2023-1419 (Fed. Cir. April 21, 2025) .................................................22

*Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) ................21

*Mid-Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019).....................20

*Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*, 853 F. Supp. 2d 1290 (Ct. Int'l Trade 2012)......................................................................................24

*Dongkuk S&C Co., Ltd. v. United States*, 600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022).........19, 21

<u>Administrative Authorities</u>

*Biodiesel from Indonesia*, 83 Fed. Reg. 8835 (Dep't of Commerce Mar. 1, 2018).....................16

*Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Dep't of Commerce Apr. 16, 2004)..............................................................................14, 17

*Certain Oil Country Tubular Goods From Saudi Arabia*, 79 Fed. Reg. 41,986 (Dep't Commerce July 18, 2014)........................................................................................20

*Finished Carbon Steel Flanges From India*, 87 Fed. Reg. 13,701 (Dep't Commerce Mar. 10, 2022...............................................................................................20

*Forged Steel Fluid End Blocks from Italy*, 85 Fed. Reg. 79,996 (Dep't of Commerce Dec. 7, 2020) ...................................................................................................................16

*Frozen Warmwater Shrimp from Indonesia: Final Affirmative Determination of Sales at less-Than Fair Value*, 89 Fed. Reg. 85,498 (Dep't Commerce Oct. 28, 2024) ...................................14

*Pure Magnesium from Israel*, 66 Fed.Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) 14, 17,20

*Welded Line Pipe From the Republic of Korea*, 84 Fed. Reg. 27,762 (Dep't Commerce June 14, 2019) ........................................................................................................................20

Other Authorities

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ..........................................12, 13

**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF ASPA'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, and this Court's July 2, 2025, Order,

ECF No. 20, Defendant-Intervenor, PT Bahari Makmur Sejati ("BMS"), a foreign producer and

exporter of frozen warmwater shrimp from Indonesia, responds to Plaintiff American Shrimp

Processors Association's September 2, 2025, Motion for Judgment on the Agency Record, ECF

No. 21 ("ASPA Brief"). As discussed herein, the arguments made by ASPA challenging (1) the

U.S. Department of Commerce's acceptance of BMS's cost reporting and (2) Commerce's

constructed value profit and selling expense calculations in the antidumping duty investigation of

frozen warmwater shrimp from Indonesia are without merit.

## I.     STATEMENT PURSUANT TO RULE 56.2(c)

The administrative determination under consideration is *Frozen Warmwater Shrimp from

Indonesia: Final Affirmative Determination of Sales at less-Than Fair Value*, 89 Fed. Reg.

85,498 (Dep't Commerce Oct. 28, 2024) ("*Final Determination*"). The challenged

determination, findings, and conclusions are set forth in Commerce's unpublished Issues and

Decision Memorandum (Dep't Commerce Oct. 21, 2024) ("*Decision Memorandum*"), P.R. 338.

## II.    ISSUES OF LAW PRESENTED

1.  Whether Commerce's reliance on BMS's reported cost information was supported by
    substantial evidence when Commerce determined that BMS used multiple different-
    sized raw shrimp inputs to produce any given finished shrimp product and Commerce
    found that there were no inconsistencies between BMS's raw shrimp purchase
    records and its reported shrimp material costs.

2.  Whether Commerce's selection of surrogate financial data for its constructed value
    profit and selling expense ratio calculations was supported by substantial evidence
    and otherwise in accordance with law when Commerce relied on the only financial
    statements available of an Indonesian producer of identical merchandise that also was
    profitable in the same business segment.

## III.    <u>SUMMARY OF ARGUMENT</u>

ASPA challenges two aspects of Commerce's final determination in the antidumping

duty investigation of frozen warmwater shrimp from Indonesia, but fails to provide adequate

reasons for the Court to displace the agency's findings.

ASPA first argues that Commerce erred when it accepted as complete and accurate the

shrimp material portion of BMS's reported costs of manufacture.  But Commerce relied on

substantial record evidence to find (1) that BMS used multiple different-sized raw shrimp inputs

to produce any given finished shrimp product and (2) that there were no inconsistencies between

BMS's raw shrimp purchase records and its reported shrimp material costs.  Because BMS's

methodologies for reporting its production quantities and costs were reasonable and because

Commerce's acceptance of these methods was consistent with statutory authorities, previous

court decisions, and the agency's past practice, Commerce's reliance on BMS's reported costs of

manufacturing was supported by substantial evidence and in accordance with law.

Second, ASPA argues that Commerce selected an inappropriate source for determining

BMS's constructed value profit and selling expenses.  But Commerce narrowly selected its basis

for CV information from among multiple potential sources.  And while each potential source had

shortcomings, Commerce fully explained its decision to rely on the financial statements of the

single Indonesian shrimp producer, PT Panca Mitra Multiperdana Tbk, which not only

represented the full-year financial experience of an Indonesian manufacturer of identical

merchandise, but also was the only surrogate company that reported profitable sales of subject

merchandise during the period examined.  The agency's selection from among the available

options thus was reasonable and in accordance with law.

## IV.  <u>ARGUMENT</u>

### A.  BMS Accurately Reported the Shrimp Material Portion of Its Costs of Manufacture and Commerce Reasonably Relied Upon Those Costs

Plaintiff ASPA argues that BMS did not accurately allocate its raw shrimp acquisition costs to the costs of each CONNUM of shrimp produced, and that Commerce's reliance on BMS's reported costs was not supported by substantial evidence. *See* ASPA Brief, at 18. But ASPA's argument is based on its misunderstanding of BMS's standard shrimp cost reporting methodology. An examination of BMS's description of this methodology, as well as references to Commerce's cost verification report, verification exhibits, and final decision memorandum, confirm that Plaintiff ASPA misapprehends – and inaccurately presents to the Court – BMS's shrimp cost reporting. Because the shrimp material portion of BMS's reported costs of manufacture costs accurately reflects BMS's shrimp costs during the period of investigation on a product-specific basis, the Court should find that Commerce's reliance on BMS's reported costs was supported by substantial evidence.

### 1.  Plaintiff ASPA's Arguments Are Based on a Misunderstanding of BMS's Cost Reporting Methodology

ASPA's claims with respect to BMS's cost reporting are not supported by the administrative record, and the Court should sustain Commerce's findings that BMS's reported shrimp material cost data were reliable and consistent with BMS's shrimp purchase reporting. ASPA argues in its brief that BMS's reported shrimp material costs are inaccurate because of an alleged "mismatch between the quantities of raw shrimp *purchased* per count size … and the quantities of those count sizes *consumed* as reflected in {BMS's} cost allocation worksheets." ASPA Brief, at 20 (emphasis added). Specifically, ASPA claims that the quantity of raw shrimp of a specific head-on count size that BMS "purchased" during the POI and reported in Exhibit D-12 ("purchase prices by count size") of its original Section D cost response is different from the

quantity of the raw shrimp that BMS "consumed" to produce the reported merchandise under

consideration with identical head-on ("HO") count sizes during the POI, as reported in Exhibit

D-14 ("product-specific cost allocation worksheet").  *See id.* at 11, 13.  But ASPA

misunderstands what the HO count sizes in Exhibit D-14 represent.  While ASPA correctly

describes Exhibit D-12 as reporting the count size, quantity, and average prices of BMS's raw

shrimp purchases during the POI, Exhibit D-14 does *not* report the *actual* HO shrimp sizes

*consumed* during the POI.  Rather, the "SIZE H/O" and "RM Cost Standard" data reported in

Exhibit D-14 (the first page of which is provided in **Attachment 1**) represent "the ***standard*** sizes

and extended ***standard*** costs of head-on shrimp material that BMS ***assigned*** to each finished

product produced during the POI."  BMS Commerce Rebuttal Brief (Sept. 23, 2024), at 2, C.R.

407, P.R. 322.  ASPA's description of the count sizes in Exhibit D-14 as "those of the raw

materials that were *input* into BMS's production of finished products" therefore is incorrect.

ASPA's claims of mismatches between purchase quantities and consumption quantities thus are

predicated on the same fallacy.  ASPA Brief, at 13.  Furthermore, ASPA's claim that it was

equating "identical" data when it "compared the count-sizes of the purchased shrimp in Exhibit

D-12 to the sizes of raw material inputs identified in Exhibit D-14" thus also is wrong.  *See*

ASPA Brief, at 20; *see also* BMS Section D Response (January 29, 2024), at Exhibits D-12 and

D-14, C.R. 110, P.R. 136.

      ASPA's claims of differences between count size-specific purchase quantities and count

size-specific consumption quantities might make sense if BMS had allocated its purchased raw

shrimp material purchases to finished shrimp products on a type-by-type, order-by-order, and

size-by-size basis, in which specific shrimp purchases were linked to specific finished shrimp

products.  But BMS does not maintain an accounting system that records, classifies, aggregates,

and allocates shrimp costs in the normal course of business; nor does BMS maintain any records that would allow it to do so.  BMS Section D Response, at D-16, C.R. 110, P.R. 136.  BMS therefore could not link its actual raw shrimp purchases directly to the finished shrimp products that it produced.  *See* BMS Section D Response, at D-16, C.R. 110, P.R. 136; *see also Decision Memorandum* at 5, P.R. 338.  Instead, for Commerce's investigation, BMS adopted a standard cost system for allocating its POI shrimp costs in which BMS (1) assigned in Exhibit D-14 a ***theoretical*** *starting head-on shrimp size* for each type and size of finished shrimp product produced during the POI, and (2) used its actual POI-average shrimp-size specific purchase costs from Exhibit D-12 as a *standard* shrimp cost for each of these *theoretical* starting head-on shrimp sizes.  BMS Section D Response, at D-21, C.R. 110, P.R. 136.

Importantly, BMS did not invent this shrimp cost reporting methodology out of thin air. BMS reported to Commerce that for each product that the company produced, BMS maintained product-specific "head-on shrimp to finished good" yield factors for management purposes and for assistance in production planning.  BMS Section D Response, at D-21, C.R. 110, P.R. 136.[1] To report its shrimp material consumption costs to Commerce, BMS first estimated "the volume of raw shrimp material needed to produce each unique product {by dividing} the POI total production quantity of each product by the yield factor necessary to produce the finished

---

[1]  **Attachment 2** contains a chart of BMS's product-specific production yields that the company presented to Commerce at the cost verification.  BMS Cost Verification Exhibits (June 13, 2024) at Exhibit 3, pages 25-28, C.R. 270, P.R. 275.  For each type and size range of product produced, BMS maintained process-specific yield factors.  To determine the final yield rate, BMS multiplied the yield rate of each step that the finished good underwent.  For example, EZ PEEL IQF Shrimp with a 16/20 pieces per pound size range underwent a de-heading step (head-on to headless) involving a [

].

product." *Id.* at D-27, C.R. 110, P.R. 136.[2] Then, using its production yields, "BMS assigned

starting shrimp raw material count sizes to each finished product produced … {and} … assigned

an original head-on shrimp material cost per kilogram to each finished product produced." *Id.*[3]

By adopting this approach, and by multiplying the quantity of shrimp material needed to produce

the POI production volume of each finished product by the assigned standard shrimp cost, BMS

calculated "the total ***estimated*** raw shrimp material costs" for each finished shrimp product.

BMS then "divided its POI actual costs of [                    ] rupiah for all fresh shrimp

material purchased by the total calculated standard shrimp material costs of [                    ]

---

[2]    For example, to produce [

                                                              ].

[3]    The chart in **Attachment 2** shows that for each type and size range of product produced,
       BMS maintained a "target" finished good count size. BMS Cost Verification Exhibits (June
       13, 2024) at Exhibit 3, pages 25-28, C.R. 270, P.R. 275. For example, to produce EZ PEEL
       IQF Shrimp with an average of 16/20 pieces per pound, BMS's "target" count size was [  ]
       pieces per pound. Using this product's processing yield of [    ], BMS estimated that
       production beginning with HO shrimp of approximately [    ] pieces per kilogram would
       result in the target size of [
                                              ]. *See id.* (showing this product on page 26 and
       the formula on page 28). In Exhibit D-14, BMS then assigned its POI average cost for size
       [   ] HO shrimp as the ***standard*** cost for EZ PEEL IQF Shrimp size 16/20 pieces per pound.
       Importantly, using HO shrimp inputs that were both larger and smaller also would result in
       finished shrimp falling within the 16/20 pieces per pound count size range for this product.
       For example, using HO shrimp of approximately [    ] pieces per kilogram would result in a
       finished shrimp size of [    ] pieces per pound). Or, using HO shrimp of approximately [    ]
       pieces per kilogram would result in a finished shrimp size of [    ] pieces per pound). BMS
       therefore could have produced EZ PEEL IQF Shrimp with an average of 16/20 pieces per
       pound using raw HO shrimp that ranged from [        ] pieces per kilogram, confirming
       Commerce's finding that BMS could use multiple sizes of HO raw shrimp to produce the
       same finished product. *See Decision Memorandum* at 7, P.R. 338. Moreover, by always
       using "target" finished product sizes that were at the top end of the size ranges, BMS
       assigned standard costs to different products consistently and did not "allocate{e} costs away
       from certain products and over-report{} the costs to other products," as ASPA incorrectly
       alleges. *See* ASPA Brief, at 13.

rupiah to calculate a variance, which BMS then applied to the *estimated* costs to derive the

*actual* shrimp material costs to assign to each finished shrimp product." *Id.*, C.R. 110, P.R. 136.

In its supplemental cost response, BMS further explained its approach of assigning

*standard* starting head-on shrimp costs to each product produced (standards that were based on

BMS's actual POI-wide head-on, count-size specific shrimp purchase costs):

> BMS used its *actual* raw shrimp purchase prices during the POI to establish the
> ***standard*** *costs per count size per kilogram that it used to allocate shrimp material
> costs during the POI*. When assigning the ***standard*** raw shrimp material costs,
> BMS's guiding principle was to adopt ***standard*** costs that were both accurate and
> reasonable. In the very few cases where the actual purchase prices that BMS paid
> during the POI for particular count sizes did not follow the normal trend or the
> expected cost – typically because the shrimp purchased were irregular or
> otherwise damaged – BMS assigned count-size specific ***standard*** costs of either
> the next larger or nest smaller count size cost in order to avoid assigning ***standard***
> costs that were aberrational.

BMS 1st Sec. D Supp. Response (May 10, 2024), at SuppD-8, C.R. 203, P.R. 227. Commerce

well understood BMS's reporting methodology when it asked BMS to use product [          ] as

an example to demonstrate how BMS used "***standard*** product-specific yield information to

calculate the product-specific costs for reporting purposes." BMS responded:

> Using the yield rate of [      ] for product [          ], BMS calculated that it
> would require [          ] kilograms of size [    ] head-on shrimp to produce
> the [        ] kilograms of product [          ] that BMS produced during
> the POI (*i.e.*, [                      ]). Applying a
> ***standard*** head-on shrimp cost of [        ] {Indonesian Rupiah ("IDR")}/kg for
> size [    ] head-on shrimp, BMS calculated that the total ***standard*** shrimp cost to
> produce the [          ] kilograms of product [            ] thus would be
> [                  ] IDR (*i.e.*, [                  ]). BMS
> adjusted this ***standard*** amount by the variance between the total actual POI
> shrimp raw material costs of [                  ] IDR and the total ***standard*** POI
> raw material costs of [                ] IDR to derive the ***actual*** shrimp
> materials costs of [                      ] IDR to produce the [          ]
> kilograms of product [          ].

BMS 1st Sec. D Supp. Response (May10, 2024), at SuppD-6 to SuppD-7, C.R. 203, P.R. 227.[4]

What is clear from all of these descriptions is that the head-on shrimp material sizes that BMS

reported in Exhibit D-14 did not represent the only size shrimp materials used to produce the

finished products, but rather represented theoretical starting head-on shrimp material sizes, from

which BMS derived starting standard costs for purposes of allocating its actual costs.  While

BMS assigned the standard cost of HO count size 33 raw shrimp to [          ] kilograms of

finished shrimp products in Exhibit D-14, BMS did not – as ASPA incorrectly claims – have

[                                                                                              ] ASPA Brief, at 14.  BMS's

reported shrimp material costs thus were not based on "mismatches" or contradictory data, and

substantial evidence supports Commerce's conclusion that BMS's reported cost data were

accurate and reliable.

That the initial costs that BMS assigned to each finished shrimp product were based on

*standard* costs (*i.e.*, one standard starting HO shrimp size with one corresponding POI-wide

average purchase cost)  – and not on actual size-specific purchase quantities also has a basis in

---

[4]    In its 1st Section D Supp. Response, BMS confirmed that it revised downwards its total
*standard* POI shrimp material costs from [                    ] IDR to [                    ]
IDR because of a correction to the POI production quantity of one product (to exclude sauce
content).  This slight revision supports the essence of a standard cost system, *i.e.*, that
changes in the standard costs for any one product will affect the calculation of total standard
costs, which (without changing the total actual shrimp costs) necessarily will affect the
allocation of total actual costs to each product:

> Because BMS's shrimp material cost allocation methodology adjusts **standard**
> shrimp material costs to actual costs by applying a variance, the change to the
> costs of one product necessarily impacts the costs assigned to all products.

BMS 1st Sec. D Supp. Response (May 10, 2024), at SuppD-12, C.R. 203, P.R. 227.  This
explanation corroborates that BMS adopted a standard cost approach for reporting its shrimp
raw material costs, and confirms as incorrect ASPA's claim that the Exhibit D-14 shrimp
count sizes and quantities reflected actual shrimp input consumption.

logic.  Every finished shrimp product produced and sold by BMS had a count size range, *e.g.*, 26-30 pieces per pound, 31-40 pieces per pound, 51-60 pieces per pound, *etc.*, and thus each product could not have been produced by a single-size HO shrimp input and necessarily would have been produced using different size head-on shrimp inputs.  *See* BMS Section D Response, at Exhibit D-14.  Importantly, although BMS did not rely on all of its actual head-on shrimp purchase counts sizes to establish the starting HO shrimp standard costs in Exhibit D-14, BMS nonetheless relied on its total purchases of shrimp to calculate the variance that it applied to the extended standard shrimp costs to establish BMS's reported actual shrimp costs.  *See* **Attachment 1**; *see also* BMS Section D Response (January 29, 2024), at Exhibit D-14, C.R. 110, P.R. 136.

Throughout the course of Commerce's investigation, BMS repeatedly and consistently explained that it did not rely on an actual cost system for cost accounting, and that it instead relied on its actual POI average size-specific shrimp material purchase prices to develop standard costs, which it then used to allocate costs to each shrimp product produced.  Moreover, Commerce verified that BMS assigned "fresh shrimp material costs during the POI to finished products based on the form of the finished product, BMS's production yield experience, and the company's POI size-specific weighted-average shrimp material unit purchase costs."  BMS Cost Verification Report (Aug. 6, 2024), at 12, C.R. 398, P.R. 308.  Given that BMS used standard shrimp material costs in Exhibit D-14 as the basis for allocating its actual shrimp consumption costs, there is no disconnect between the actual POI purchase prices and quantities that BMS reported in Exhibit D-12 and the standard HO shrimp costs reported in Exhibit D-14.  As such, the Court should put to the side ASPA's incorrect understanding of BMS's shrimp material cost reporting, and sustain Commerce's correct recognition of how BMS reported its costs.

## 2.    BMS Did Not Report Contradictory Shrimp Material Input Sizes

In addition to erroneously conflating the concepts of "standard costs" and "actual consumption," Plaintiff ASPA repeatedly (and incorrectly) claims that "BMS reported different raw material input sizes in Exhibit D-14 for the [                    ]." *See* ASPA Brief, at 14, 15 (twice), 20, and 21. ASPA presumably makes this argument to support its assertion that there were "inconsistencies between BMS's records and its reported costs." *See id.* at 15. But ASPA defines [                    ] simply as products that [                    ], and ignores entirely that shrimp products with different degrees of processing have different degrees of production yields, and thus require different input count sizes. *Id.* at 14. For example, ASPA expresses concern that for shrimp products with a finished product size of [                    ], BMS reported standard starting HO raw shrimp sizes of [                    ]. *See* ASPA brief, at 14. But this is entirely normal considering that these were not the [                    ] as ASPA claims, and instead were [                    ] that underwent different stages of processing, resulting in different final yield rates that required different sized shrimp inputs. As illustration, BMS reported the following processing stage-specific processing yield gains and losses for finished shrimp products with a final count size of 13-15 pieces per pound:

| Size | Description | | Target Count | HO to HL A | Peeling B | Soaking C | Cooking D | Final Yield E=A*B*C*D | HO | |
|------|-------------|---|--------------|------------|-----------|-----------|-----------|----------------------|-----|---|
| 13/15 | HEADLESS BLOCK FROZEN | [ | | | | | | | | ] |
| 13/15 | HEADLESS IQF | [ | | | | | | | | ] |
| 13/15 | EZ PEEL IQF | [ | | | | | | | | ] |
| 13/15 | PEELED DEVEINED TAIL ON IQF | [ | | | | | | | | ] |
| 13/15 | COOKED PEELED DEVEINED TAIL ON | [ | | | | | | | | ] |

See **Attachment 2**. As shown in this chart, "Headless" shrimp that was either block frozen or individually quick frozen (IQF) underwent only the de-heading stage (head-on to headless) stage of processing. "EZ Peel" shrimp (that was prepared for easy peeling, but that was not peeled)

underwent the de-heading stage (resulting in a yield loss) and the soaking stage (resulting in a yield gain). Peeled, deveined, tail-on shrimp underwent the de-heading, peeling, and soaking stages. And cooked, peeled, deveined, tail-on shrimp underwent the de-heading, peeling, soaking, and cooking stages. As Commerce verified, "{t}he final yield of a final shrimp product … is calculated by multiplying the yield rate of each production step (*i.e.*, head on to headless, peeling, soaking, cooking) for that final shrimp product." BMS Cost Verification Report (Aug. 6, 2024), at 13, C.R. 398, P.R. 308. Because finished products falling within the same final count size can undergo very different processing stages, what ASPA refers to as the [

] thus actually can be quite different and can require substantially different starting count size shrimp material inputs.

ASPA's argument that it was not reasonable for Commerce to accept BMS's "assignment of different-sized inputs with different [                                  ] products" thus is not supported by the record evidence. *See* ASPA Brief, at 21. In this case, Commerce verified that BMS "was able to demonstrate how the various components of its reporting methodology was supported by information maintained in the normal course of business," and Commerce itself provided a full explanation for its acceptance of BMS's accurate cost reporting. *See* Decision Memorandum, at 5-7, P.R. 338. As such, the Court should sustain Commerce's conclusion that BMS's reported cost data was reliable and consistent with its shrimp purchase reporting.

### B. Commerce's Calculation of BMS's Constructed Value Profit and Selling Expenses Was Supported by Substantial Evidence and Lawful

#### 1. Commerce's Reliance on the PMMP Data Was Reasonable

Commerce reasonably determined that the fiscal year 2022 financial statements of PT Panca Mitra Multiperdana Tbk ("PMMP"), an Indonesian producer of identical merchandise with sales in Indonesia, were the best available information on the record for calculating BMS's

constructed value profit and selling expenses.  Because Commerce's decision was reasonable

and supported by substantial evidence, this Court should sustain Commerce's determination.

When calculating dumping margins, Commerce normally compares the "export price" or

"constructed export price" of merchandise under investigation (meaning the prices in the United

States market) to "normal value" (meaning the prices in the home market or in a third-country

market).  19 U.S.C. §§ 1677(35), 1677b(a)(1)(A)-(C).  In its investigation of frozen warmwater

shrimp from Indonesia, Commerce thus normally would have compared the prices of frozen

warmwater shrimp sold to the United States to the prices of frozen warmwater shrimp sold in

Indonesia as the exporting country or in a third country comparison market.  However,

Commerce determined that BMS did not have sufficient volumes of above-cost frozen

warmwater shrimp sales either in Indonesia or in a third-country market.  Commerce therefore

was unable to calculate normal value using comparison market selling prices, and relied instead

on "constructed value" for determining the normal value.  *See Decision Memorandum* at 26, P.R.

338; *see also* 19 U.S.C. §§ 1677b(a)(4), (b)(1); Statement of Administrative Action

Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, at 839 (1994),

*reprinted in* 1994 U.S.C.C.A.N. 4040, 4175 (SAA) ("constructed value serves as a proxy for a

sales price").[5]

Under the antidumping statute, Commerce calculates the "constructed value" of imported

merchandise based on the sum of (1) the cost of materials and fabrication or other processing

employed in producing the merchandise; and (2) certain amounts incurred for selling, general,

---

[5]    Pursuant to 19 U.S.C. § 3512(d), the SAA is "an authoritative expression by the United
       States concerning the interpretation and application of the Uruguay Round Agreements and
       this Act in any judicial proceeding in which a question arises concerning such interpretation
       or application."

and administrative (SG&A) expenses, interest expenses, U.S. packing expenses, and profit in the exporting country. *See* 19 U.S.C. § 1677b(e). This statutory method expresses a preference for the profit and selling expenses to reflect "the *actual* amounts incurred and realized by the specific exporter or producer being examined in the investigation" in connection with the production and sale of the foreign like product by the respondent in the exporting country. *Id.*; *see also* SAA at 839, *reprinted in* 1994 U.S.C.C.A.N. 4175-76. But if the preferred method is unavailable – as in this case – the statute provides three alternative methods for Commerce to calculate SG&A expenses and profit. *See* 19 U.S.C. §§ 1677b(e)(2)(B)(i), (ii), and (iii). The statute does not establish a hierarchy for selecting among these three alternatives, and permits Commerce to select any of the three methods, depending on the record information available. *See* SAA at 840 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4176 ("At the outset, it should be emphasized that ... new section {1677b(e)(2)(B)} does not establish a hierarchy or preference among these alternative methods. Further, no one approach is necessarily appropriate for use in all cases."). Hence, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data." *Id.*

In this investigation, Commerce determined that two of the three alternative methods were not available. Specifically, Commerce found that calculating selling expenses and profit (1) under 19 U.S.C. § 1677b(e)(2)(B)(i) (the actual amount of profit realized by the respondent on its home market sales of the "same general category" of products) and (2) under 19 U.S.C. § 1677b(e)(2)(B)(ii) (the weighted-average of the actual amounts of profit realized by other respondents on their home market sales in the ordinary course of trade of the foreign like product) were unavailable because (1) BMS's other products did not constitute the same general category of merchandise as frozen warmwater shrimp and (2) the other Indonesian respondent

being individually investigated, *i.e.*, First Marine/Khom Foods, did not have sufficient

comparison market sales of the foreign like product. *Decision Memorandum* at 27, P.R. 338.

Commerce therefore calculated BMS's constructed value profit and selling expenses using the

third alternative approach outlined in 19 U.S.C. § 1677b(e)(2)(B)(iii), which permits Commerce

to calculate SG&A and profit using:

> (iii) the amounts incurred and realized or selling, general, and administrative
> expenses, and for profits, *based on any other reasonable method*, except that the
> amount allowed for profit may not exceed the amount normally realized by
> exporters or producers (other than the exporter or producer described in clause (i))
> in connection with the sale, for consumption in the foreign country, of merchandise
> that is in the same general category of products as the subject merchandise;

19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added). While the language of this alternative method

suggests a preference that the profit and selling expenses should reflect (1) production and sales

in the foreign country; and (2) the foreign like product, this is not an absolute statutory

requirement. As explained by Commerce, "we may not be able to find a source that reflects both

factors," and "in addition there may be varying degrees to which a potential profit source reflects

the {merchandise under consideration}. Consequently, we must weigh the quality of the data

against these factors." *Decision Memorandum* at 27, P.R. 338.

In employing a "reasonable method" in this case, Commerce followed the practice that it

established in *Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27,

2001), Decision Memorandum at Comment 8, and supplemented in *Certain Color Television

Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Dep't of Commerce Apr. 16, 2004), Decision

Memorandum at Comment 26. That is, in considering what financial data would be most

appropriate for calculating the profit and selling expense components of normal value,

Commerce followed its standard practice and considered (1) the similarity of the potential

surrogate companies' business operations and products to the respondent's business operations

and products; (2) the extent to which the financial data of the surrogate company reflected sales

in the home market and did not reflect sales to the United States; (3) the contemporaneity of the

surrogate data to the period of investigation; and (4) the extent to which the customer base of the

surrogate company and the respondents were similar (*e.g.*, original equipment manufacturers

versus retailers). *See Decision Memorandum* at 27-29, P.R. 338.

Guided by this practice, Commerce declined to use the financial statements of four other

Indonesian producers available on the record, determining that each of these alternate sources

fell short of Commerce's preferred criteria. *See Decision Memorandum* at 28-29, P.R. 338.

Specifically, Commerce determined that the financial statements of PT Cilacap Samudera

Fishing Industry Tbk ("CSFI") were unsuitable because CSFI primarily produced fish, did not

produce merchandise identical to the frozen warmwater shrimp produced by BMS, and was

engaged in a number of unrelated and non-similar industries. *See Decision Memorandum* at 28,

P.R. 338. Similarly, Commerce determined that the financial statements of PT Dharma

Samudera Fishing Industries Tbk ("DSFI") were inappropriate because DSFI primarily produced

fish and was involved in other aquatic activities, such as processing and preservation of other

aquatic biota unrelated to the subject merchandise. *See Decision Memorandum* at 28, P.R. 338.

Commerce also did not consider the financial statements of PT Japfa Comfeed Indonesia Tbk

("Japfa") because Japfa was engaged primarily in the livestock business. *See Decision

Memorandum* at 28, P.R. 338.

Last, Commerce declined to use the financial statements of PT Central Proteina Prima

Tbk ("CP Prima"). Record information established that the vast majority of CP Prima's

production and sales were of shrimp feed, fish feed, and pet food products, and that CP Prima

was not primarily a producer of merchandise comparable to frozen warmwater shrimp. *See*

ASPA's CV Profit Submission (March 1, 2024), at Exhibit 1, pdf page 82, P.R. 167.  That CP

Prima's business scope did not align with that of BMS was sufficient to exclude CP Prima's

financial data from the calculation of constructed value profit and selling expenses.  *See Forged*

*Steel Fluid End Blocks from Italy*, 85 Fed. Reg. 79,996 (Dep't of Commerce Dec. 7, 2020),

Decision Memorandum at Comment 2 (the CV profit rate should not be calculated using a

surrogate company's financial information when that financial information demonstrates that a

significant portion of the company's sales were of non-subject merchandise).  However,

Commerce ultimately rejected CP Prima's financial statements because the company's seafood

product business segment (which included merchandise comparable to frozen warmwater

shrimp) incurred a loss in fiscal year 2022.  *See Decision Memorandum* at 28, P.R. 338.

Commerce explained that its practice is to evaluate the business segment-specific information

reported in potential financial statements to determine whether a company's profit calculations

can be associated with the subject merchandise; and that when a potential surrogate company is

not profitable in the business segment related to comparable merchandise, its financial

statements should not be used to calculate constructed value profit and selling expenses.  *See*

*Decision Memorandum* at 28, P.R. 338; *see also Biodiesel from Indonesia*, 83 Fed. Reg. 8835

(Dep't of Commerce Mar. 1, 2018), Decision Memorandum at Comment 5 (potential surrogate

financial statements were not a viable source for CV profit when the company experienced a loss

in the segment of operations related to subject merchandise).  In this case, because the CP Prima

business segment that was most closely-related to BMS's operations experienced a financial loss

during 2022, Commerce concluded that CP Prima's financial statements were not an appropriate

surrogate for computing BMS's CV profit and selling expense ratios.  *See Decision*

*Memorandum* at 29, P.R. 338.

Instead, Commerce concluded that the 2022 financial statements of PT Panca Mitra Multiperdana Tbk ("PMMP") were the most representative financial statements of a domestic producer of merchandise under investigation, and, therefore, were the most suitable source and the best available information on the record for calculating BMS's constructed value profit and selling expenses. *See Decision Memorandum* at 29, P.R. 338. In particular, Commerce found that PMMP's financial statements reflected the operations of an Indonesian producer of the subject merchandise and that because PMMP produced the identical merchandise, it was reasonable to presume that its respective production experience, raw material consumption, and facilities resembled those of BMS. *See Decision Memorandum* at 29, P.R. 338. Commerce also determined that PMMP's profit experience and customer base closely matched those of BMS. *See Decision Memorandum* at 29, P.R. 338. Furthermore, Commerce found that PMMP's 2022 financial statements were contemporaneous with BMS's period of investigation, and that although PMMP's operations were primarily export-oriented (with most of its sales going to the United States), the company nonetheless had sales in Indonesia of frozen warmwater shrimp and had made a profit on such sales. *See Decision Memorandum* at 29, P.R. 338. Under the long-standing criteria established in *Pure Magnesium from Israel* and *Certain Color Television Receivers from Malaysia*, Commerce thus reasonably found that PMMP's financial statements were the most appropriate information available on the record to calculate BMS's CV profit and selling expenses.

In its Rule 56.2 Memorandum of Law, ASPA does not contest Commerce's findings with respect to three of the four criteria normally considered in determining what financial data would be most appropriate for calculating the profit and selling expense components of normal value. First, ASPA does not contest that PMMP's business operations and products are virtually

identical to BMS's business operations and products.  For example, PMMP's financial statements show that PMMP produces subject merchandise identical to BMS, including raw shrimp, cooked shrimp, and value-added shrimp merchandise.  *See* BMS Section A Response (Dec. 28, 2023), at A-22 to A-24, Exhibit A-15, C.R. 58, 64, 65, P.R. 112, 113, 114; *see also* First Marine CV Profit Submission (March 1, 2024), at Exhibit 2 pdf pages 24-26, P.R. 163. Moreover, like BMS, PMMP "runs a business in the processing of shrimp-based frozen food … equipped with production facilities (processing plans) and cold storage, focusing on Vannamei and Black Tiger shrimp."  *See* BMS Section D Response (Jan. 29, 2024), at Exhibit D-4, C.R. 110, P.R. 136; First Marine CV Profit Submission (March 1, 2024), at Exhibit 2 pdf page 57, P.R. 163.  Further, PMMP's financial statements demonstrate that the company primarily produces subject merchandise, since over 65% of PMMP's total sales were of cooked and raw frozen warmwater shrimp.  *See* First Marine CV Profit Submission (March 1, 2024), at Exhibit 2 pdf page 83, Exhibit 3, P.R. 163.

Second, ASPA does not contest the contemporaneity of the surrogate PMMP financial data to the period of investigation.  PMMP's 2022 financial statements overlapped with the period of investigation for BMS, and no other financial statements on the record covered a greater portion of the POI than PMMP's.  *See* First Marine CV Profit Submission (March 1, 2024), at Exhibits 2, 4, and 6, P.R. 163, 164; ASPA's Letter, "Financial Statements for Profit and Selling Expenses" (March 1, 2024), at Exhibits 1 and 2, P.R. 167.

Third, ASPA does not challenge or question the extent to which PMMP's and BMS's customer bases were the same.  Like BMS, PMMP sold subject merchandise to the United States during the POI [                                                                                    ]. *See* Memorandum Re. Less-Than-Fair-Value Investigation of Frozen Warmwater Shrimp from

the Republic of Indonesia:  Respondent Selection (November 29, 2023), C.R. 49, P.R. 84.  And

there is nothing on the record indicating that PMMP's U.S. customers were unlike those of BMS.

Moreover, PMMP's financial statements reflected a full year of financial data and profitable

results for the sale of frozen warmwater shrimp.  *See* First Marine CV Profit Submission (March

1, 2024), at Exhibit 2, P.R. 163.

Altogether, ASPA disputes only the extent to which PMMP's financial data reflected

sales in Indonesia and did not reflect sales to the United States, arguing that "by selecting a

company with an extremely small quantity of domestic sales for its expense and profit

calculations, Commerce deviated from its long-standing and consistent practice *without*

*explanation*."  ASPA Brief at 27 (emphasis added).  But contrary to ASPA's claim, Commerce

did provide a detailed explanation for its decision.   As enumerated above, Commerce found that

(1) "PMMP's financial statements are the most representative financial statements of a domestic

producer of MUC, and, therefore, are the most suitable source for calculating CV profit"; (2)

"{b}ecause PMMP produces the identical merchandise, it is reasonable to presume that its

respective production experience, raw material consumption, and facilities resemble those of the

respondents"; (3) PMMP's "profit experiences and customer bases closely match those of BMS";

and (4) PMMP's financial statements "are contemporaneous with the POI."  *Decision*

*Memorandum* at 29, P.R. 338.  Most important, Commerce reasonably explained that although

PMMP's operations were "primarily export-oriented with most of the sales going to the United

States, PMMP had domestic sales which incurred a profit."  *Decision Memorandum* at 29, P.R.

338; *see also Dongkuk S&C Co., Ltd. v. United States*, 600 F. Supp. 3d 1331, 1340 (Ct. Int'l

Trade 2022) (sustaining Commerce's reliance on financial statements that reflected only some

production and sales of comparable merchandise in the Korean market to determine CV profit).

This decision falls squarely within Commerce's broad discretion to determine a reasonable

method for determining constructed value profit and selling expenses in an antidumping

investigation.  Commerce's decision in this case also was consistent with other determinations in

which Commerce has weighed a variety of factors to determine which financial statements were

the most appropriate for the calculation of constructed value profit and selling expenses.  *See*

*e.g.*, *Welded Line Pipe From the Republic of Korea*, 84 Fed. Reg. 27,762 (Dep't Commerce June

14, 2019), Decision Memorandum at Comment 4 (emphasizing the need to consider the quality

of the data available with the statutory preferences); *see also Finished Carbon Steel Flanges*

*From India*, 87 Fed. Reg. 13,701 (Dep't Commerce Mar. 10, 2022), Decision Memorandum at

Comment 2.  As in these prior proceedings Commerce weighed the value of the available data,

and determined which "competing requirements {were} more relevant for this case."  *Certain*

*Oil Country Tubular Goods From Saudi Arabia*, 79 Fed. Reg. 41,986 (Dep't Commerce July 18,

2014), Decision Memorandum at 4.  Altogether, Commerce evaluated the data available,

weighed each of the alternatives, and reasonably relied on PMMP's financial statements, rather

than CP Prima's, to calculate CV profit and selling expenses.[6]

ASPA also argues that CP Prima's financial statements are superior to PMMP's because

of its higher percentage of home market sales of non-comparable merchandise.  *See* ASPA Brief,

at 24.  But the *Pure Magnesium from Israel* analysis criteria do not require Commerce to rely on

financial data from the company with the highest percentage of comparable merchandise sales in

---

[6]    Ironically, in making its arguments, ASPA lauds the Federal Circuit's finding in *Mid-Continent Steel & Wire, Inc. v. United States* that "the statutory language {of 19 U.S.C. § 1677b(e)} allows Commerce to consider whether the information suffices for use in making accurate calculations," 941 F.3d 530, 539 (Fed. Cir. 2019), and yet ignores this holding in arguing that Commerce should not have relied on PMMP's "domestic sales which incurred a profit" in this case.  *See* ASPA Brief, at 29; *see also Decision Memorandum* at 29, P.R. 338.

the exporting country or to disregard a company's financial data if it has a low percentage of domestic sales. Commerce acknowledged in this case that CP Prima was a frozen warmwater shrimp producer located in Indonesia. *See Decision Memorandum* at 28, P.R. 338. But Commerce's concern regarding CP Prima was not whether the company had sufficient quantities of home market sales (even if they mostly were non-subject merchandise). Rather, the critical reason for Commerce's determination not to rely on CP Prima's financial statements was that CP Prima *was not profitable for the sector of merchandise comparable to frozen warmwater shrimp*, a point ASPA does not even address in its brief. The antidumping statute requires constructed value to include an element of profit, and when a company's sales of comparable merchandise are not profitable, then no profit exists. Negative financial results generated by unprofitable sales thus cannot represent the profit and selling expenses "normally realized by exporters or producers" for purposes of estimating an appropriate amount of positive profit under the statute. *See* 19 U.S.C. § 1677b(e)(2)(B)(iii). As such, Commerce reasonably found that CP Prima's financial statements could not reflect suitable surrogate data for calculating BMS's constructed value profit and selling expenses.

Ultimately, ASPA's disagreement with Commerce's weighing of the record evidence is not a valid basis to overturn Commerce's reasonable determination. *See Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) (Court does not reweigh evidence); *see also Dongkuk v. United States*, 600 F. Supp. 3d at 1340 ("While Plaintiff may have preferred that Commerce select SeAH Steel Corporation's financial statement {for determining constructed value profit and selling expenses}, Plaintiff has failed to demonstrate that Commerce acted unreasonably by selecting SHCC's statement instead."). In this case, Commerce weighed the potential surrogate CV profit sources against the applicable factors,

acknowledged the trade-off posed by using PMMP's data versus those of CP Prima, and

concluded that PMMP's financial statements were the only financial data that reflected the

contemporaneous profit and selling expenses for the production and sale of merchandise in the

Indonesian market, while also being based on the financial data of a company whose profits and

selling expenses were based the *profitable* sales of comparable and/or identical merchandise.

Commerce's determination that PMMP's profit and selling expense data were the best available

information for calculating BMS's constructed value was reasonable, supported by substantial

evidence, and otherwise lawful.  ASPA's belief that the *Pure Magnesium from Israel* factors

should favor CP Prima's data does not disturb Commerce's purview to decide which of two

imperfect sources of data to use under 19 U.S.C. § 1677b(e)(2)(B)(iii).  As the Federal Circuit

has held, "{w}here we are faced with two opposing views of the record, it is the function of the

court to uphold Commerce's determination if it is supported by substantial evidence and

otherwise in accordance with law." *Dongkuk v. United States*, 2023-1419 (Fed. Cir. April 21,

2025), at 17.  Here, the Court is presented with a record that amply supports the reasonableness

of Commerce's decision to select PMMP's financial statements as the source for calculating CV

profit and selling expenses.  The Court thus should sustain Commerce's use of PMMP's data

under 19 U.S.C. § 1677b(e)(2)(B)(iii).

### 2.   Arguments Related to Market Viability Are Not Relevant

Plaintiff also argues that Commerce's use of PMMP's 2022 financial statements to

calculate the profit and selling expense portions of constructed value for BMS was not

reasonable because Commerce would have found that PMMP's home market sales of frozen

warmwater shrimp were "insufficient to permit a proper comparison with the sales of the subject

merchandise to the United States" under 19 U.S.C. § 1677b(a)(1) if PMMP had been an

individually examined mandatory respondent in the investigation.  *See* ASPA Brief at 28.

As an initial matter, what Commerce would have done if PMMP was a mandatory respondent is a red herring. Commerce did not select PMMP as a mandatory respondent in the less-than-fair-value investigation, and thus what would have happened had Commerce selected PMMP as a mandatory respondent is simply conjecture. No record evidence supports Plaintiff's speculation that the aggregate quantity of PMMP's home market sales of the foreign like product would have been insufficient to permit a comparison with sales of subject merchandise to the United States, especially when the period covered by PMMP's 2022 fiscal year financial statements overlapped the period of investigation for reportable sales by only three months.

But, more importantly, Plaintiff ASPA misstates the law. Under 19 U.S.C. § 1677b(e)(2)(A), the profit and selling expenses calculated for constructed value are "the *actual* amounts incurred and realized by the specific exporter or producer being examined in the investigation" in connection with the production and sale of the foreign like product by the respondent in the exporting country. Contrary to Plaintiff's claim, the statute does not establish any threshold percentage that a company's home market sales must represent of its total sales for that company's profit percentage to be used for constructed value purposes, As such, the statute therefore permits comparison market sales representing less than five percent of the quantity of U.S. sales to be used to establish a reasonable profit level.

The Court should be wary of ASPA's attempt to graft Commerce's market viability test used to determine the representativeness of sales to the methodology Commerce uses to determine constructed value profit. The purpose of Commerce's five percent comparison market viability threshold (under 19 C.F.R. § 351.404) is to test whether there are enough quantities of merchandise sold in the foreign market to allow for sufficient price comparisons (*i.e.*, to form the basis of normal value), and not to establish a reasonable level of profit. The different statutory

and regulatory provisions serve very different purposes, and the measure of Commerce's test for

determining the representativeness of the volumes of merchandise sold across markets cannot be

applied to restrict the "any other reasonable method" determination of a profit amount under 19

U.S.C. § 1677b(e)(2)(B), especially when the statute specifically directs Commerce to consider

the three alternate profit calculation methods enumerated under 19 U.S.C. § 1677b(e)(2)(B) in

exactly the situation Plaintiff claims exists with respect to PMMP, *i.e.*, "if actual data are not

available with respect to the amounts described in subparagraph (A)." Here, Plaintiff's argument

is inconsistent with established practices of statutory construction that seek to interpret the

statutory scheme as a harmonious whole, and thus should be disregarded. *See, e.g.*, *Baroque

Timber Industries (Zhongshan) Co., Ltd. v. United States*, 853 F. Supp. 2d 1290 (Ct. Int'l Trade

2012) (statute should be interpreted as a "symmetrical and coherent regulatory scheme").

## V.    <u>CONCLUSION</u>

For the reasons stated above, BMS respectfully requests that this Court reject Plaintiff

American Shrimp Processors Association's arguments and affirm Commerce's final antidumping

duty determination regarding frozen warmwater shrimp from Indonesia.

Respectfully submitted,

<u>/s/ Robert G. Gosselink</u>
Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  March 13, 2026                        Counsel to PT Bahari Makmur Sejati

# Attachment 1

**Not Capable of Summary**

# Attachment 2

**Not Capable of Summary**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| |
|---|
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, <br><br>      Plaintiff, <br> v. <br><br> UNITED STATES, <br><br>      Defendant, <br> and <br><br> PT Bahari Makmur Sejati, <br><br>      Defendant-Intervenor. |

Court No. 25-00027

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Trade Pacific PLLC certifies that the foregoing PT Bahari Makmur Sejati Response Brief, dated March 13, 2026, complies with the word-count limitation described in the Standard Chambers Procedures. The response brief contains 7,725 words according to the word-count function of the word-processing software used to prepare this brief.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink

**TRADE PACIFIC PLLC**
700 Pennsylvania Ave., SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Defendant-Intervenor
PT Bahari Makmur Sejati

March 13, 2026