**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| AMERICAN SHRIMP PROCESSORS ASSOCIATION<br><br>          Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>    and<br><br>PT BAHARI MAKMUR SEJATI,<br><br>          Defendant-Intervenor. | **PUBLIC VERSION**<br><br>Ct. No. 25-00027<br><br>Business Proprietary Information<br>Identified by Single Brackets [ ]<br>and Removed from Pages i, 1-7, and 9-11 |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT**

**ON THE AGENCY RECORD**

Roger B. Schagrin
Elizabeth J. Drake
William A. Fennell
Alessandra A. Palazzolo
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel to American Shrimp Processors Association*

April 10, 2026

PUBLIC VERSION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT: THE COST ISSUE .................................................................................... 1

I.  Reply to Defendant United States' Response Brief .............................................. 1

  A.  Commerce Must Rely on Costs that Reflect the Cost of Production and Sale of the Merchandise It Is Investigating .................................................. 1

  B.  BMS's Calculations Support ASPA's Position ............................................ 3

  C.  ASPA Correctly Stated that BMS Admitted that Its Reporting Was Not Accurate .. 6

II.  Reply to BMS's Response Brief .......................................................................... 8

  A.  The Size-Specific Shrimp Purchase Costs Used by BMS Were Not "Standard" Costs .......................................................................................... 8

  B.  BMS Has Chosen the [                                    ] to Select Its Shrimp Input Purchase Prices ............................................................... 9

ARGUMENT: CV PROFIT ISSUE ................................................................................ 13

I.  Reply to Commerce's Response Brief ................................................................ 13

  A.  Commerce Has Not Explained How It Was Reasonable for It to Determine Domestic Profits Using the Financials of a Company Whose Profits Were Driven Entirely by its Export Sales ...................................................... 13

  B.  The Federal Circuit's Reasoning in *Mid Continent* Supports ASPA's Position ...... 14

II.  Reply to BMS's Response Brief ........................................................................ 16

  A.  BMS Is Similarly Unable to Identify a Logical Connection between Commerce's Profit Choice and the Facts of Record ...................................... 16

  B.  ASPA Has Not Misstated the Law .............................................................. 16

CONCLUSION ............................................................................................................. 18

PUBLIC VERSION

## TABLE OF AUTHORITIES

**Cases**

*Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016)...................... 15

*Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*, 853 F. Supp. 2d 1290 (Ct. Int'l Trade 2012) ................................................................................................................ 16

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ............................................ 7

*Mid Continent Steel & Wire, Inc. v. United States, 941 F.3d 530 (Fed. Cir. 2019)*........... 3, 14, 16

*NMB Sing. Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ........................................ 11, 14

*Novartis AG v. Torrent Pharm. Ltd.,* 853 F.3d 1316 (Fed. Cir. 2017) .......................................... 3

*Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93 (2012) ................................................................ 16

*Universal Camera Corp. v. NLRB,* 340 U.S. 474 (1951) .............................................................. 3

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ............. 7

**Statutes**

19 U.S.C. § 1677b(a)(1)............................................................................................................ 17

19 U.S.C. § 1677b(a)(1)(C) ...................................................................................................... 15

19 U.S.C. § 1677b(e)(2)(A) ...................................................................................................... 16

19 U.S.C. § 1677b(f)(1)(A).................................................................................................... 1, 8

**Legislative History**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, 103rd Cong. (1994), *reprinted in reprinted in 1994 U.S.C.C.A.N. 4040, 4172*................................................................................................................................ 8

Uruguay Round Agreements Act, S. Rep. No. 103-413 (1994) ................................................... 17

Plaintiff the American Shrimp Processors Association ("ASPA" or "Plaintiff") submits the following reply brief in support of its motion for judgment on the agency record in the above-captioned action.  ASPA replies to the response brief filed by the Defendant United States (ECF No. 30), and that filed by Defendant-Intervenor PT Bahari Makmur Sejati ("BMS") (ECF No. 31).

## ARGUMENT: THE COST ISSUE

I.    **Reply to Defendant United States' Response Brief**

A.    **Commerce Must Rely on Costs that Reflect the Cost of Production and Sale of the Merchandise It Is Investigating**

The statute requires that the costs the U.S. Department of Commerce ("Commerce") uses to calculate cost of production and constructed value must reasonably reflect the costs associated with the production and sale of subject merchandise.  19 U.S.C. § 1677b(f)(1)(A).  In its 56.2 brief, ASPA has demonstrated that the costs reported by BMS did not reasonably reflect the company's costs.  *See* ASPA 56.2 Brief at 19-23 ("*ASPA Brief*"), ECF No. 21.

In its response brief, Commerce has asserted that "{b}ecause one purchase of one size shrimp may be used for multiple finished products, Commerce could not rely on BMS's purchases for its input products." Defendant Response Brief at 9 ("*Defendant Resp.*"), ECF No. 30.  It also "reasonably concluded that estimated and actual values of consumed and purchased shrimp, respectively, would not be identical, and Commerce's acceptance of BMS's cost-reporting despite the mismatch is therefore lawful." *Id.* at 11.

These statements highlight the critical issue in ASPA's appeal, an issue that Commerce has ignored in its response.  Contrary to Commerce's statement, BMS has in fact relied on its purchases for its cost reporting.  The problem is that instead of including the costs of all of its shrimp purchases to calculate its reported costs, BMS has assigned the costs for a [

1

PUBLIC VERSION

] to determine all of its product costs.  BMS chose the size-specific shrimp costs for [                                                    ] to value all of its production.  Specifically, as ASPA showed in Exhibit 1b to its case brief, BMS reported period of investigation ("POI") purchases of [

] the costs of all its production. *See Petitioner's Cost Case Brief* at Exhibit 1b (Sept. 16, 2024), C.R. 405.[1]

While BMS's shrimp purchases and consumption cost allocations may be acceptable even if they are not directly connected, there must be a reasonable correlation between them, or else the consumption values used by BMS to report its costs have no relation to its actual costs. That is what is missing from BMS's cost response.  Nowhere in its questionnaire responses does BMS demonstrate, much less assert, that [

] its purchases of shrimp during the POI. In fact, as ASPA demonstrates below, without regard to its actual shrimp costs, BMS has allocated the [                            ] to its products.

Commerce's blind determination that BMS's unmatched purchases and cost reporting were "lawful" was unreasonable and unsupported by substantial evidence, as there was no connection between its conclusion and the facts of record.  BMS relied on the purchase prices of [                                        ] without explaining how it was reasonable to do so, nor did Commerce provide any explanation for its conclusion that this was reasonable.  In its decision memorandum, Commerce reviews its analysis of BMS's reporting, noting that

---

[1] Citations to the public record documents are designated as "P.R." and citations to the confidential record documents containing business proprietary information are designated as "C.R."

"{d}uring the cost verification, BMS company officials explained that if BMS does not have sufficient raw shrimp of the ideal {head-on ('HO')} count size to produce their 'target' count-size finished products, they may use other sizes to produce the target HO count-size finished product." Issues and Decision Memorandum ("IDM") at 7, P.R. 338. Commerce explained the implications of this: "{i}n other words, the HO shrimp raw material input sizes that BMS associates with each finished product in Exhibit D-14 for reporting purposes are not the only sizes that could be consumed for the given product." *Id.*

Nowhere in the record below does BMS or Commerce explain why it was reasonable for BMS to use the purchase price for one size input as the material cost for products produced using multiple size inputs with different prices, particularly when shrimp products of specific sizes require minimum raw shrimp input sizes. For factual determinations, substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion" considering the record as a whole. *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537 (Fed. Cir. 2019), *citing to Novartis AG v. Torrent Pharm. Ltd.,* 853 F.3d 1316, 1324 (Fed. Cir. 2017) and *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487-88 (1951).

### B.    BMS's Calculations Support ASPA's Position

BMS has included in its response brief, as Attachment 2, a chart of the product-specific production yields that the company presented to Commerce at cost verification. BMS Response Brief at 5, n.1 ("*BMS Resp.*"), ECF No. 31. The chart shows the [


]. There are [                                                    ]. *Id.* at Attachment 2. These are the values that BMS has used to select a size-specific purchase price from BMS's Section D Response exhibit of size-specific purchase prices, Exhibit D-12. Each of these purchase prices

3

PUBLIC VERSION

has been used to determine [

].

The Attachment 2 chart highlights the problem with BMS's reporting.  BMS has asserted that the input sizes it chose for its cost reporting were "standard" sizes.[2]  BMS Commerce Rebuttal Brief (Sept. 23, 2024) at 2, P.R. 322.  However, BMS has not explained anywhere on the record why its "standard" sizes produce reasonable estimates of costs that are tied to its purchases of shrimp.  In fact, the record demonstrates otherwise.

As BMS showed in Exhibit D-12 to its Section D response, the smaller the shrimp, the higher the count size[3] and the [                                        ].  *See Commerce Product Characteristics Memo* at 2-3 (Jan. 10, 2024), P.R. 122.  The finished products sold by BMS each had count size ranges, *e.g.*, [                          ] The [

                                                                                 ].  *See BMS Resp.* at Attachment 2,

ECF No. 31. Thus, when BMS [

---

[2] *See* demonstration that "standard" sizes were anything but in ASPA's reply to BMS's brief below.

[3] Shrimp are sized according to the number of shrimp per pound or kilogram. Thus, the smaller the shrimp, the more that can fit per pound, and the higher the count size.

PUBLIC VERSION

].  You cannot produce shrimp of a particular count from shrimp that are too small.

As an example, one of the input HO sizes that appears in Attachment 2 is [    ].  Using the formula identified in Attachment 2,[4] we can compute the [            ] for smaller sizes of shrimp as shown in the table below.

| [ | | | | | | ] |
|---|---|---|---|---|---|---|
| [ | | | | | | ] |
| [ | | | | | | ] |
| [ | | | | | | ] |
| [ | | | | | | ] |

Data source: *ASPA Brief* at Exhibit 1a, ECF No. 21.

The table shows that [

].  *Petitioner's Cost Case Brief* at Exhibit 1(a), C.R. 405.  BMS reported in Exhibit D-14 to its Section D response that it used [

].  *See id.*  This means that BMS would have had to use [

].[5]

---

[4] As modified to compute [

].

[5] Note: Attachment 2 shows that [        ] (per kilogram) shrimp were used to produce a [

5

Consider an analogy: suppose that you were costing out the production costs for a particular model of a personal computer ("PC"). Suppose that the most expensive elements of the PC were the four identical computer chips (chip "A") that you were planning to use in the production of the computer. The chip you planned to use cost $50. However, as you went to produce the PC, you determined that you had only one chip "A." You saw that you had in stock some other chips that you could substitute for chip "A", two more powerful than chip "A" (cost: $75) and one slightly less powerful (cost: $45). So you used them to produce your computer. Would you nonetheless determine that the chip input cost for the PC was $200, the cost of the original four chip "A"s? Or would you determine that the cost was $245, the cost of the four different chips you actually used to produce the PC?

### C.    ASPA Correctly Stated that BMS Admitted that Its Reporting Was Not Accurate

Commerce objects to ASPA's assertion that BMS admitted that its reporting was not accurate, asserting that ASPA provided no citation for this assertion. *Defendant Resp.* at 13, ECF No. 30. As is shown in Attachment 1 to BMS's response brief (the first page of BMS's Exhibit D-14), BMS assigned a specific [

]. *See BMS Resp.* at Attachment 1, ECF No. 31, page taken from Exhibit D-14, BMS's Section D Questionnaire Response ("*BMS Sec. D*"), C.R. 110. As ASPA showed in its case brief in the investigation, the price assigned to [

].

---

].

6

*See Petitioner's Cost Case Brief* at Exhibit 1b, C.R. 405. In other words, [

].

Yet, BMS said that "the head-on shrimp material sizes reported in Exhibit D-14 did not represent the only size shrimp materials used to produce the finished products, but rather represented the theoretical starting head-on shrimp material sizes, from which BMS could derive starting standard costs for purposes of allocating its actual costs." *BMS Rebuttal Brief* at 5, P.R. 322. In other words, BMS admitted that the single shrimp price it used to report the cost for each finished product costs was not, in fact, the price it actually paid for the shrimp used to produce that product. BMS confirms this in its response brief: "Exhibit D-14 does *not* report the *actual* HO shrimp sizes *consumed* during the POI." *BMS Resp.* at 4, ECF No. 31. In sum, BMS admitted that those prices were not accurate.

Commerce asserts that, in its IDM, it articulated an explanation for its acceptance of BMS's reporting that connects the facts found and the choices it made. *Defendant Resp.* at 11-12, ECF No. 30. As demonstrated above, there is no rational connection between the costs of the shrimp that BMS has purchased and the costs it has assigned to its products. For a reviewing court to "fulfill {its} obligation" to determine whether a determination of Commerce is supported by substantial evidence and in accordance with law, Commerce is required to "examine the record and articulate a satisfactory explanation for its action." *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (*quoting Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

II.    **Reply to BMS's Response Brief**

A.    **The Size-Specific Shrimp Purchase Costs Used by BMS Were Not "Standard" Costs**

BMS states that "the 'SIZE H/O' and 'RM Cost Standard' data reported in Exhibit D-14 . . . represent the *standard* sizes and extended *standard* costs of head-on shrimp material that BMS *assigned* to each finished product produced during the POI." *BMS Resp.* at 4, ECF No. 31 (emphasis in original), *citing BMS Rebuttal Brief* at 2, P.R. 322.  BMS's alleged "standard" sizes were not based on some norm that was established before the investigation.  These were in fact values that BMS chose to assign to different products for purposes of its Section D questionnaire.[6]  In that questionnaire, BMS explained that:

> In the normal course of business, BMS does not maintain product-specific costs; nor does BMS calculate standard costs for the products it manufactures. No standard costs are collected, no variances are accumulated, and there is no reconciliation between a cost accounting and financial accounting system.

> BMS Section D Response at D-17 (Jan. 21, 2024), P.R. 136.

It further explained:

> BMS does have standard product-specific yield information, which it maintains for management purposes and also for assistance in production planning, and which it has used in this response to calculate the product-specific costs. These yields are calculated whenever BMS begins producing a new product.

> *Id.* at D-21.

And:

> Again, using its production yields, BMS assigned starting shrimp raw material count sizes to each finished product produced. Using the POI weighted-average head-on shrimp costs from **Exhibit D-12**, BMS then assigned an

---

[6] These "standards" would not meet the statute's requirement that Commerce consider "all available evidence on the proper allocations of costs" as they have not been historically used by BMS.  *See* 19 U.S.C. § 1677b(f)(1)(A). The legislative history of the Implementation of the Uruguay Round Agreements Act notes that in the context of § 1677b(f)(1)(A), cost allocation is historical if it has been used prior to the investigation or review.  *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, 103rd Cong. at 835 (1994) ("SAA"), *reprinted in reprinted in 1994 U.S.C.C.A.N. 4040, 4172*.

8

PUBLIC VERSION

original head-on shrimp material cost per kilogram to each finished product produced.

*Id.* at D-27.

Thus, BMS has identified the one actual standard that it relied on to report its costs: its product-specific yield information.  Nowhere does BMS explain how it developed and maintained its alleged "standards" for target counts prior to Commerce's investigation.  It does not do so because its "standards" were created by BMS to meet Commerce's requirements for reporting costs in its Section D response.  As BMS maintained no standard product-specific costs, it had to develop costs for its response.

In the last of the three quotes above, BMS states that it relied on its standard production yields to assign first count sizes and then an original head-on shrimp material cost to each finished product. Thereby, BMS implies that its cost reporting was driven entirely by its standard production yields and reported shrimp purchase prices. It was not; BMS omits one critical element, *i.e.*, its choice of specific finished product target counts.

**B.      BMS Has Chosen the [                                                    ] to Select Its Shrimp Input Purchase Prices**

The finished products sold by BMS each had count size ranges, *e.g.*, [

] As noted above, the "target count" chosen by BMS for each of its products was the same as, or almost the same as, the [                                                    ] in the reported product range. *BMS Resp.* at Attachment 2, ECF No. 31. In that Attachment, BMS has identified a number of [


] To demonstrate the effect of BMS's choice on its cost reporting, we show in the table below the shrimp costs for the [

9

PUBLIC VERSION

] if it had chosen different [

]:

| | A | B | C | A*B*C | | | |
|---|---|---|---|---|---|---|---|
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |

Data sources: *BMS Resp.* at Attachment 2, ECF No. 31, taken from Exhibit 3, pages 25-28, BMS's Cost Verification Exhibits, C.R. 270; BMS Section D Questionnaire Response, Exhibit D-12, C.R. 110.

In a footnote that discusses its Attachment 2, BMS asserts that "by always using 'target' finished product sizes that were at the 'top end' of the size ranges, BMS assigned standard costs to different products consistently and did not 'allocate{e} costs away from certain products and over-report{} the costs to other products.'" *BMS Resp.* at 5, n. 3, ECF No. 31. In fact, BMS's choices had the opposite effect. By selecting target product sizes that were at the "top end" of its *count* size ranges, which are at the lowest end of the *actual* sizes, BMS has allocated the [

] to its products. The "top end" of a count size is the smallest possible shrimp size, as shrimp counts are inverse to actual shrimp sizes. The larger the count size, the smaller the shrimp. Smaller shrimp are [                                        ]. *See* BMS Section D Questionnaire Response, Exhibit D-12, C.R. 110. Thus, by choosing the [

10

PUBLIC VERSION

].

As BMS explained and showed in Exhibit D-14, its shrimp input costs were the starting

point for its build-up of total costs for each product. *See BMS Sec. D* at D-26-D-27, C.R. 110.

As BMS has chosen [

] perfect correlation

between its purchases and its shrimp consumption costs.  While asserting that there was no direct

correlation between its shrimp purchases and its reported shrimp costs, BMS has reported those

costs as if they were in fact correlated.  Exhibit D-12 shows that this was not the case. It shows

purchases of over [

]. ASPA has demonstrated above, in its 56.2 brief, and in its original

case brief, that these were not aligned. *See ASPA Brief* at 12 (ECF No. 21) and *Petitioner's Cost*

*Case Brief* at Exhibit 1(a), C.R. 405.  Additionally, in Exhibit 1 to its case brief, BMS itself

asserted that they were not, and Commerce agreed that they were not.[7]  *See Defendant Resp.* at

11, ECF No. 30..

BMS states that it "could not link its actual raw shrimp purchases directly to the finished

shrimp products that it produced." *BMS Resp.* at 5, ECF No. 31.  Therefore, BMS devised a new

methodology to report its costs.  BMS did not make a supportable showing that its reported

product costs incorporated its POI shrimp costs in a reasonable manner. Thus, the record shows

---

[7] ASPA notes that in its response brief, BMS showed that because of different [            ]
different input count sizes could be used to produce [
            ] *BMS Resp.* at 10, ECF No. 31.  This explains the different raw material [
                        ] that ASPA had highlighted in its
56.2 brief at 14. BMS's table on page 10 of its brief highlights the fact that whatever the finished
product, BMS selected the [
            ] input costs for those products. *Id.*

that its reported costs did not accurately represent its costs of producing and selling its shrimp products.  Yet Commerce has accepted BMS's cost reporting as accurate without determining or explaining how the reported costs accurately incorporated its POI shrimp purchase costs. "Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009). Commerce's reliance on BMS's costs here was not supported by substantial evidence.

PUBLIC VERSION

### ARGUMENT: CV PROFIT ISSUE

I.  **Reply to Commerce's Response Brief**

   A.  **Commerce Has Not Explained How It Was Reasonable for It to Determine Domestic Profits Using the Financials of a Company Whose Profits Were Driven Entirely by its Export Sales**

In its response brief, Commerce states that it explained its acceptance of PMMP financials for CV profit for its final determination in its IDM because PMMP produced identical merchandise and that "its profit experiences and customer base closely matched those of its respondents." *Defendant Resp.* at 18, ECF No. 30. Commerce's full explanation in its IDM was:

> PMMP's financial statements reflect the operations of an Indonesian producer of the subject merchandise. Because PMMP produces the identical merchandise, it is reasonable to presume that its respective production experience, raw material consumption, and facilities resemble those of the respondents. The record also indicates that the respective profit experiences and customer bases closely match those of BMS and First Marine/Khom Foods. In addition, the financial statements are contemporaneous with the POI, and although its operations are primarily export-oriented with most of the sales going to the United States, PMMP had domestic sales which incurred a profit. Therefore, under the criteria of *Pure Magnesium from Israel*, we find that the PMMP financial statements are the most appropriate information on this record for purposes of calculating CV profit and selling expenses in this proceeding.

IDM at 29, P.R. 338.

Commerce's purpose in selecting a company for CV profit was to select a company that earned its profits from sales in Indonesia, not from exports. In this case, the reason Commerce had to select a separate company to determine a CV profit rate for mandatory respondents (BMS and First Marine/KHOM Foods) was that respondents sold all of their products for export and made no domestic sales. *Id.* at 26. Yet PMMP's profile is virtually identical: it sold for export and, because it had domestic sales of only $636,789 out of a total of $190,671,111 in sales 2022, its profit ratio was driven entirely by exports. *See First Marine's Comments on CV Profit and*

*Selling Expenses* (Mar. 1, 2024) at Exhibit 2, pages 94 and 106, P.R. 163 ("*First Marine's CVP*").

In its 2022 financial statement, PMMP reported the geographic distribution of its sales. This chart showed no domestic sales, but sales to the United States (79.8%), Japan (17.7%), and Other (South Korea, Singapore, Hong Kong, Denmark, and the United Kingdom) (2.5%). *See First Marine's CVP* at Exhibit 2, page 46, P.R. 163. Moreover, PMMP reported that it began sales of shrimp domestically less than two years before 2022. *Id.* at Exhibit 3, pdf page 301. Consider the relative ratios of these sales: if a company sells 299 Type A widgets and 1 Type B widget, its profits are not going to be driven, or even affected, by the one sale of a Type B widget.

Commerce avers that "{w}eighing the foregoing information, {it} elected to use PMMP's financial statements." *Defendant Resp.* at 18, ECF No. 30. What Commerce has not done is explain how, weighing the evidence, it selected a company with virtually no domestic sales and extensive export sales as a reasonable candidate to use to determine a domestic profit amount and CV profit ratio. Again, Commerce must explain the basis for its decisions: "the path of Commerce's decision must be reasonably discernable to a reviewing court." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009). That path is not apparent on this record, and Commerce's reliance on PMMP for a profit ratio was not supported by substantial evidence.

**B.    The Federal Circuit's Reasoning in *Mid Continent* Supports ASPA's Position**

Commerce asserts that the decision by the Court of Appeals for the Federal Circuit ("Federal Circuit") in *Mid Continent* does not support ASPA's argument. *Defendant Resp.* at 19, ECF No. 30. In that case, a respondent argued if there were any home market sales available, Commerce should rely on them in determining constructed value profits under 19 U.S.C. §

14

1677b(c)(2)(A). *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 538 (Fed. Cir. 2019) ("*Mid Continent*"). The Court rejected the argument. *Id.*

The Federal Circuit noted that Commerce's rejection of the respondent's argument in that case had relied in part "on Congress's quantity-focus embodied in a closely related provision." *Id.* That provision is 19 U.S.C. § 1677b(a)(1)(C), which "allows use of certain third-country sales if the aggregate quantity or value of home-country sales is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States," and it adds that the quantity "shall normally be considered to be insufficient" if it is less than five percent of sales of the merchandise to the U.S. 19 U.S.C. § 1677b(a)(1)(C). *Id.*

The Federal Circuit did not think that the five-percent standard applied directly to Commerce's decision regarding the basis for CVD profit, but the Court concluded that the "statute does not exclude Commerce's practical, function-based understanding of 'available,' as applied to the data identified in §1677b(e)(2)(A)." *Id.* The Court further reasoned that "{b}ecause 'accuracy and fairness must be Commerce's primary objectives' in this task . . . the statutory language allows Commerce to consider whether the information suffices for use in making accurate calculations—which may well depend on the volume of home-country sales and how that volume affects the reliability of the information used for Commerce's accomplishment of its assigned task." *Id.* at 38-39, *citing Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1354 (Fed. Cir. 2016).

If Commerce may exercise such judgment when deciding whether there are sufficient home market sales under § 1677b(c)(2)(A), then, consistent with the Federal Circuit's reasoning, the need to exercise such judgment will carry over to the agency's judgment under the alternative methods as to whether the information provided by any company will suffice to make accurate

15

calculations.  Commerce must assess whether the information it has selected will result in accurate calculations.

## II.     Reply to BMS's Response Brief

### A.     BMS Is Similarly Unable to Identify a Logical Connection between Commerce's Profit Choice and the Facts of Record

BMS provides in its response brief a review of the relevant statutes and agency decisions that govern Commerce's choice of a company for use to determine CV profit amounts. *BMS Resp.* at 11-22, ECF No. 31.  It asserts that ASPA is asking this Court to weigh its judgment against that of Commerce.  *Id.* at 21-22.  In fact, there is no judgment for the Court to substitute its judgment for: Commerce has not explained how the use of the information of a company that had virtually no domestic sales to determine a CV profit rate that is representative of home market sales is reasonable.  Absent such an explanation, this Court has no alternative but to return the action to Commerce for reconsideration.

### B.     ASPA Has Not Misstated the Law

BMS asserts that ASPA has misstated the law by claiming that the statute sets a threshold percentage of home market sales in order for its profit ratio to be used for constructed values. *BMS Resp.* at 23, ECF No. 31.  ASPA has made no such claim.  Instead, it has suggested to the Court that, as was noted by the Federal Circuit in *Mid Continent*, that when interpreting 19 U.S.C. § 1677b(e)(2)(A) – that is, when making a decision as to whether there are sufficient home market sales so that none of the alternative methods for determining profit need to be employed – Commerce may consider whether the "information suffices to make accurate calculations."  *ASPA Brief* at 29, ECF No. 21 (*citing Mid Continent,* 941 F.3d at 539). As ASPA pointed out, the Federal Circuit also noted that "{o}n the purely legal question of ambiguity in the statute … we may consider other relevant statutory provisions, helping us to better

16

understand the statutory terms at issue 'in their context and with a view to their place in the overall statutory scheme.'" *Mid Continent*, 941 F.3d at 539, *citing Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012).

BMS objects to ASPA's suggestion that the five percent market viability standard under 19 U.S.C. § 1677b(a)(1) should inform the interpretation of a "reasonable method" under 19 U.S.C. § 1677b(e)(2)(B)(iii).  BMS cites to *Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*, 853 F. Supp. 2d 1290 (Ct. Int'l Trade 2012), for the proposition that a statute should be interpreted as a "symmetrical and coherent regulatory scheme." *BMS Resp.* at 24, ECF No. 31. This is precisely what ASPA asks.

The statute, 19 U.S.C. § 1677b(a)(1), requires that normal value not be based on an insignificant quantity or value of sales in the home market.  The Senate Report on implementation of the Uruguay Round Agreements Act notes that a low volume of sales in the home market "do not permit a proper comparison."  Uruguay Round Agreements Act, S. Rep. No. 103-413, at 68 (1994).  The premise for this provision is that insufficient quantities are likely to be aberrational and not produce accurate normal values suitable for determining dumping. The imperative for accurate values is as strong for constructed values as for home market prices. Profit amounts are a necessary element of constructed values so that accuracy is equally paramount.  If insufficient quantities are likely to lead to inaccurate normal values and thereby inaccurate dumping determinations, profit amounts based on insufficient quantities are equally likely to lead to inaccurate dumping determinations.

17

PUBLIC VERSION

## CONCLUSION

As ASPA has demonstrated, Commerce accepted the costs reported by the respondent BMS used to determine material, processing, and overhead costs despite BMS's admission that they were not accurate. Commerce selected a company with minimal domestic sales for use to determine domestic profits and expenses, contrary to its past practice and without explanation for its change and contrary to the guidance provided by the statute.

ASPA asks this Court to remand this action to Commerce for reconsideration of: (1) its reliance on BMS's reported costs; and (2) its reliance on PMMP's financial information to determine profit and selling expenses for constructed values.

Respectfully submitted,

/s/ William A. Fennell
Roger B. Schagrin
Elizabeth J. Drake
William A. Fennell
Alessandra A. Palazzolo
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel to American Shrimp Processors Association*

18

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 5,897 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


Dated: April 10, 2026                                   /s/ William A. Fennell
                                                         William A. Fennell