**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

AMERICAN SHRIMP PROCESSORS ASSOCIATION,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

PT Bahari Makmur Sejati,

Defendant-Intervenor.

Court No. 25-00027

**PUBLIC VERSION**

Business Proprietary Information Identified by Single Brackets [ ]

**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF ASPA'S REPLY BRIEF**

Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel to PT Bahari Makmur Sejati

Dated: September 18, 2026

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

I. ARGUMENT ..... 1

A. The Court Should Disregard the New Argument in ASPA's Reply Brief That ASPA Never Presented to Commere ..... 1

B. BMS's Assignment of Standard Costs Based on the "Top End" of a Count-Size Range Was Reasonable and Did Not Result in BMS Reporting the Lowest Shrimp Costs ..... 4

1. BMS's Selection of Smaller Shrimp Input Sizes for Assigning Standard Shrimp Costs Did Not Result in Lower Reported Actual Shrimp Costs ..... 4

2. BMS's Shrimp Cost Allocation Methodology Was Consistent With Its Normal Production Records and Its Historical Production Experience ..... 9

3. The Reasonableness of BMS's Shrimp Cost Allocation Methodology Is Demonstrated by the Resulting Low Shrimp Production Cost Variance ..... 10

4. BMS's Shrimp Cost Allocation Methodology Was Consistent With BMS's Production Reality ..... 11

5. ASPA's Argument Is Based on a Misunderstanding of Count Sizes and Commercial Reality ..... 12

II. CONCLUSION ..... 13

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES


Statutes — Page

19 U.S.C. § 1677b(f) ....................8, 9, 13

28 U.S.C. § 2637(d) ....................2

Cases

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ....................3

*Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) ....................8

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ....................2

*Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370 (CIT 2009) ....................3

*Qingdao Taifa Group Co., LTD., v. United States*, 637 F. Supp. 2. 1231 (CIT 2009)....................3

*Trina Solar (Vietnam) Science & Technology Co., Ltd. v. United States*, Slip Op. 26-29 (Ct. Int'l Trade, March 17, 2026) ....................3

*Weishan Hongda Aquatic Food v. United States*, 273 F. Supp. 3d 1279 (CIT 2017) ....................3

*Zhaoqing Tifo New Fibre Co., Ltd., v. United States*, 60 F.Supp.3d 1328 (CIT 2015)....................3

Administrative Authorities

*Common Alloy Aluminum Sheet from Germany*, 89 Fed. Reg. 87584 (Nov. 5, 2024)....................6

**DEFENDANT-INTERVENOR'S RESPONSE**
**TO PLAINTIFF ASPA'S REPLY BRIEF**

Pursuant to this Court's August 26, 2026, Order, ECF No. 50, Defendant-Intervenor, PT Bahari Makmur Sejati ("BMS"), a foreign producer and exporter of frozen warmwater shrimp from Indonesia, responds to certain arguments made by Plaintiff American Shrimp Processors Association on pages 9-12 of its April 10, 2026, 2025, Reply Brief in Support of Its Motion for Judgment on the Agency Record, ECF No. 21 ("ASPA's Reply Brief"). As discussed herein, these arguments (1) constitute untimely new argumentation that are barred by the principle of exhaustion; and, in any event, (2) fail to demonstrate that Commerce's acceptance of BMS's cost reporting methodology was unreasonable.

# I. <u>ARGUMENT</u>

## A. The Court Should Disregard the New Argument in ASPA's Reply Brief That ASPA Never Presented to Commerce

In its 56.2 brief, Plaintiff ASPA argued that it was not reasonable for Commerce to have accepted BMS's reported shrimp raw material costs. *See* ASPA's Brief at 21. While ASPA acknowledged that the total quantity and value of raw shrimp material inputs that BMS purchased during the POR equaled almost exactly (*i.e.*, 99.99%) the total quantity and value of shrimp material inputs that BMS consumed during the POI and reported in its cost response to Commerce, *see* ASPA's Brief at 13, ASPA nonetheless argued:

> that a respondent could reduce costs, and thus the extent of dumping, by manipulating the costs of its products and allocating costs away from certain products and over-reporting the costs to other products. While the total costs would match, the manipulation of costs among different products would distort the dumping calculation and mask the full extent of dumping that occurred.

*Id.* (citation omitted). BMS answered ASPA's allegations of manipulation and "cost shifting" by citing Commerce's finding that BMS could use multiple sizes of HO raw shrimp to produce the

same finished product, and explaining that "by always using 'target' finished product sizes that were at the top end of the size ranges, BMS adopted an approach that assigned standard costs to different products *consistently* and did not 'allocate{e} costs away from certain products and over-report{} the costs to other products,' as ASPA incorrectly alleges." BMS Response, at n.3.

When confronted with this explanation, ASPA abandoned its argument that BMS manipulated its costs by allocating costs away from certain products and by over-reporting the costs to other products, and advanced a new argument: that "by selecting target product sizes that were at the 'top end' of its count size ranges, which are at the lowest end of the actual sizes, BMS has allocated the lowest possible shrimp costs to its products." ASPA Reply, at 10. ASPA's speculation is incorrect, and BMS explains in detail below ASPA's misunderstanding of both the facts of this case and how actual costs are calculated from standard costs and production variances. But, as an initial matter, the Court should not consider ASPA's new claim because it is not an issue that ASPA argued before Commerce (or addressed in its 56.2 Memorandum of Law), and the doctrine of exhaustion bars ASPA from raising it now for the first time.

Before commencing suit in the U.S. Court of International Trade, an aggrieved party must exhaust all administrative remedies available to it. "In any civil action … the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). The Court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies," *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013), because doing so promotes judicial efficiency, avoids unnecessary litigation, and allows the specialized administrative agency (*i.e.*, Commerce) a fair opportunity to address and resolve the technical issue and build a complete factual record before the claim is escalated to the courts.

There is no exhaustive list of exceptions to the exhaustion doctrine. Exceptions include (1) where raising the claim is futile (2) where the question is one of pure law and where it does not require further factual development (3) where a judicial decision rendered subsequent to the administrative determination materially affects the issue; and (4) where there is a lack of timely access to the confidential record. *Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1377 (CIT 2009). In addition, when Commerce does not address an issue until its final decision, a party may seek judicial review of the issue because the party would not have had a full and fair opportunity to raise the issue at the administrative level. *Qingdao Taifa Group Co., LTD., v. United States*, 637 F. Supp. 2. 1231, 1236 (CIT 2009). Further, the Courts have found that requiring exhaustion would be burdensome if it would result it in undue prejudice to subsequent assertion of a court action. *Corus Staal BV v. United States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007); *Weishan Hongda Aquatic Food v. United States*, 273 F. Supp. 3d 1279, 1288 (CIT (2017), and unnecessary if the issue had been raised before the agency by a different party. *Zhaoqing Tifo New Fibre Co., Ltd., v. United States*, 60 F.Supp.3d 1328, 1353 (CIT 2015).

None of these exceptions applies here. All of the factual information relied upon by ASPA in making its argument were properly on the administrative record prior to the filing of case briefs at Commerce, and ASPA chose not to pursue this line of argumentation at that time. The Court should not permit ASPA to circumvent the process by making this argument now. "The law helps those who help themselves, generally aids the vigilant, but rarely the sleeping, and never the acquiescent." *Trina Solar (Vietnam) Science & Technology Co., Ltd. v. United States*, Slip Op. 26-29 (Ct. Int'l Trade, March 17, 2026), at 8, *citing Hannan v. Dusch*, 153 S.E. 824, 831 (Va. 1930). ASPA's silence with respect to BMS's target sizes being at the "top end" of count size ranges might not have been intentional acquiescence, but it certainly amounted to

sleeping. Because ASPA failed to exhaust its administrative remedies, the Court should disregard this new line of argumentation.

### B. BMS's Assignment of Standard Costs Based on the "Top End" of a Count-Size Range Was Reasonable and Did Not Result in BMS Reporting the Lowest Shrimp Costs

ASPA argues in its Reply Brief that "by selecting target product sizes that were at the 'top end' of its count size ranges, which are at the lowest end of the actual sizes, BMS has allocated the lowest possible shrimp costs to its products"; that "BMS did not make a supportable showing that its reported product costs incorporated its POI shrimp costs in a reasonable manner"; and that "Commerce's reliance on BMS's costs here was not supported by substantial evidence." ASPA Reply, at 10, 11, 12. BMS describes below the many ways in which ASPA misunderstands and misrepresents BMS's standard shrimp cost reporting methodology. Because Commerce found that the shrimp material portion of BMS's reported costs of manufacture costs both accurately and reasonably reflected BMS's shrimp costs during the period of investigation on a product-specific basis, the Court should find that Commerce's reliance on BMS's reported shrimp costs was supported by substantial evidence.

#### 1. BMS's Selection of Smaller Shrimp Input Sizes for Assigning Standard Shrimp Costs Did Not Result in Lower Reported Actual Shrimp Costs

As repeatedly stressed by BMS throughout the investigation and this appeal and repeatedly ignored by Plaintiff ASPA – the head-on shrimp sizes and costs that BMS initially assigned to each finished product were not the actual POI shrimp costs, but represented "the ***standard*** sizes and extended ***standard*** costs of head-on shrimp material that BMS assigned to each finished product produced during the POI." BMS Commerce Rebuttal Brief (Sept. 23, 2024), at 2, C.R. 407, P.R. 322. In its Reply Brief, ASPA claims that "by choosing the smallest possible shrimp inputs for each of its products, BMS has reported shrimp costs that are as low as

possible." ASPA Reply, at 10. But in making this claim, ASPA fails to recognize that the "standard" head-on shrimp costs assigned by BMS to the shrimp inputs were not the final actual shrimp costs reported to Commerce. Rather, these standard costs were only the starting costs. To derive the "actual" costs reported to Commerce, BMS adjusted these standard costs (upwards in this case) by the actual POI production cost variances, i.e., the difference between what manufacturing the shrimp products was expected to cost (standard cost) and what it actually cost. BMS Section D Response, at D-27, C.R. 110, P.R. 136; *see also* BMS 1st Sec. D Supp. Response (May 10, 2024), at SuppD-8, C.R. 203, P.R. 227.

ASPA's misunderstanding is evidenced by its Reply Brief request to the Court to "consider an analogy":

> {S}uppose that you were costing out the production costs for a particular model of a personal computer ("PC"). Suppose that the most expensive elements of the PC were the four identical computer chips (chip "A") that you were planning to use in the production of the computer. The chip you planned to use cost $50. However, as you went to produce the PC, you determined that you had only one chip "A." You saw that you had in stock some other chips that you could substitute for chip "A", two more powerful than chip "A" (cost: $75) and one slightly less powerful (cost: $45). So you used them to produce your computer. Would you nonetheless determine that the chip input cost for the PC was $200, the cost of the original four chip "A"s? Or would you determine that the cost was $245, the cost of the four different chips you actually used to produce the PC?

ASPA Reply, at 6. Of course, the cost is $245. While the "standard" cost of the personal computer in ASPA's analogy would be $200, that standard cost would be adjusted upwards by the production cost variance of 22.50% (i.e., ($245 - $200) / $200) to derive the actual costs of $245 (i.e., $200 * 1.225). And that is exactly what BMS did in this case. BMS's reported shrimp costs were not the "standard" head-on shrimp costs initially assigned for the target finished good shrimp sizes as ASPA claims. Rather, BMS's final reported costs were standard costs that *subsequently were adjusted to actual costs by the production cost variance*.

To this end, the selection of standard costs that are slightly higher or slightly little lower will have little impact on the final reported costs *as long as the method used to establish the standard costs are consistent among all products* (i.e., that all products have the same slightly higher or slightly lower standard costs), as they were in this case. As indicated above and in BMS's Response Brief, "by always using 'target' finished product sizes that were at the top end of the size ranges, BMS adopted an approach that assigned standard costs to different products *consistently* and did not 'allocate{e} costs away from certain products and over-report{} the costs to other products,' as ASPA incorrectly alleges." BMS Response, at n.3.

ASPA's claim that by selecting smaller shrimp inputs with lower costs, BMS reported shrimp costs that were "as low as possible" ignores that BMS adjusted the starting standard costs it assigned to each product by the difference between its total extended standard costs and its total actual POI shrimp material costs. Commerce has long recognized that a standard cost reporting approach applies variances equal to the difference between standard and actual costs. *See Common Alloy Aluminum Sheet from Germany*, 89 Fed. Reg. 87584 (Nov. 5, 2024), Issues and Decision Memorandum, at Comment 2 ("When actual costs are less than the allocated standard costs, the variance adjustment will be negative. When actual costs exceed standard costs, the variance adjustment will be positive."). Using lower standard costs results in lower total extended standard shrimp costs, but it simultaneously increases the positive variance between standard and actual costs that must be applied later to adjust the standard costs to actual. Using lower standard costs thus ultimately results in little difference in the reported actual costs.

To illustrate this point, consider the following two hypothetical scenarios, both of which reflect the POI production by BMS of two "EZ Peel" products with size ranges of 31/35 and 51/60, where the actual shrimp material costs are an assumed 6,000,000,000 Indonesian rupiah

(IDR). In the first scenario, the target finished good sizes are at the "top end" of the count size ranges. In the second scenario, the target finished good sizes are at the corresponding "bottom end" of the count size ranges.

Total Actual Shrimp Material Costs: **6,000,000,000** A

| | Production Quantity kgs B | Size | Target Size Pcs/lb C | Yield D | KG to LB Conv. E | H/O Size C*D*E | Reported H/O Size Pcs/kg | Quantity H/O Needed F=B/D | Standard Cost IDR/kg G | Extended Standard Costs (IDR) H=F*G | Production Cost Variance (%) J=(A-I)/I | Adjusted Std. to Actual Costs K=H*(A/I) | Reported Costs IDR/kg L=K/B | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Scenario 1 | | | | | | | | | | | | | |
| [ | | | | | | | | | | | | | | ] |
| [ | | | | | | | | | | | | | | ] |
| | | | | | | | | | | 5,973,631,135 | | **6,000,000,000** | | |
| | | | | | | | | | | I | | | | |
| | Scenario 2 | | | | | | | | | | | | | |
| [ | | | | | | | | | | | | | | ] |
| [ | | | | | | | | | | | | | | ] |
| | | | | | | | | | | 6,081,686,853 | | **6,000,000,000** | | |
| | | | | | | | | | | I | | | | |

In the first scenario, the total extended standard shrimp costs (H) are lower than the actual shrimp costs (A), and a positive variance is created, the application of which *increases* the standard costs to actual. In the second scenario, the total extended standard shrimp costs (H) are higher than the actual shrimp costs (A), and a negative variance is created, the application of which *reduces* the standard costs to actual. Ultimately, in both scenarios the total shrimp costs reported (K) are identical to the actual shrimp costs incurred (A), and the differences in the calculated costs for the two products using either the "top end" or the "bottom end" of the count size ranges as the target count size are virtually zero. This illustration demonstrates that by using target product sizes that were at the "top end" of the count size ranges, BMS did not allocate "the lowest possible shrimp costs to its products." *See* ASPA Reply Brief, at 10. Furthermore, that the Scenario 2 count size 51-60 EZ Peel product has a marginally *lower* cost – i.e., the Scenario 1 count size 51-60 EZ Peel product has a marginally *higher* cost in the approach adopted by BMS – disproves ASPA's claim that BMS's choice of "the smallest possible shrimp inputs" for each of its products resulted in reported shrimp costs that were as low as possible.

In this case, Commerce verified that BMS assigned "fresh shrimp material costs during the POI to finished products based on the form of the finished product, BMS's production yield experience, and the company's POI size-specific weighted-average shrimp material unit purchase costs." BMS Cost Verification Report (Aug. 6, 2024), at 12, C.R. 398, P.R. 308. Commerce also verified that "{t}he final yield of a final shrimp product … is calculated by multiplying the yield rate of each production step (*i.e.*, head on to headless, peeling, soaking, cooking) for that final shrimp product." BMS Cost Verification Report (Aug. 6, 2024), at 13, C.R. 398, P.R. 308. Finally, Commerce confirmed that "one component of {BMS's} reporting methodology involved assigned a 'target' count size of raw material input to each finished good" and that "BMS assigned these targets drawing on its past production experience." *See* Decision Memorandum, at 7, P.R. 338. Commerce therefore understood and accepted BMS's use of finished good target sizes that were at the "top end" of the size ranges, and concluded that BMS's cost data were not "unreliable or inconsistent with its purchase reporting." *See* Decision Memorandum, at 7, P.R. 338. Commerce thus disagreed with ASPA's claim that there were any questions regarding "the overall reliability of BMS's cost reporting." *Id.*.

While ASPA might prefer that BMS had adopted a different cost calculation approach, ASPA's disagreement with Commerce's weighing of the record evidence is not a valid basis to overturn Commerce's reasonable determination. *See Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) (the Court does not reweigh evidence). Consistent with 19 U.S.C. § 1677b(f)(1)(A), Commerce found that BMS's reported shrimp costs reasonably reflected the costs associated with the production and sale of the merchandise, and Commerce's reliance on BMS's reported costs of manufacturing therefore was supported by substantial evidence and in accordance with law.

### 2. BMS's Shrimp Cost Allocation Methodology Was Consistent With Its Normal Production Records and Its Historical Production Experience

ASPA's complaint about how BMS identified the "target" size of its finished goods also ignores that BMS's reliance on its target count sizes was consistent with its normal operations. As indicated in BMS's Response Brief, BMS did not invent its shrimp cost reporting methodology for this investigation out of thin air. Rather, BMS reported to Commerce that in its normal business operations, BMS established a "target" finished good count size for each type and size range of product produced. *See* BMS Cost Verification Exhibits (June 13, 2024) at Exhibit 3, pages 25-28, C.R. 270, P.R. 275 (containing source documentation listing these target sizes). Similarly, BMS reported to Commerce that for each product, BMS also maintained in the normal course of business product-specific "head-on shrimp to finished good" processing yields for management purposes and for assistance in production planning. BMS Section D Response, at D-21, C.R. 110, P.R. 136. To report its shrimp material consumption costs to Commerce, BMS therefore used its pre-existing normal production records to estimate "the volume of raw shrimp material needed to produce each unique product {by dividing} the POI total production quantity of each product by the yield factor necessary to produce the finished product." *Id.* at D-27, C.R. 110, P.R. 136. Using the yields maintained in the ordinary course of business, BMS then "assigned starting shrimp raw material count sizes to each finished product produced." *Id.*

While ASPA complains that BMS chose "the smallest possible shrimp inputs for each of its products," ASPA Reply Brief, at 10, BMS in fact relied on its historical production records to assign the particular size shrimp material inputs to each size shrimp finished product. In doing so, BMS acted consistently with 19 U.S.C. § 1677b(f)(1)(A), which states that "costs normally be calculated *based on the records* of the exporter or producer of the merchandise." Importantly, Commerce similarly acted in conformity with the same statutory provision when it considered

"all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, *if such allocations have been historically used*." *Id.* (emphasis added). As noted above, Commerce verified in this case that BMS assigned fresh shrimp material costs during the POI to finished products "based on the form of the finished product, BMS's *production yield experience*, and the company's POI size-specific weighted-average shrimp material unit purchase costs." BMS Cost Verification Report (Aug. 6, 2024), at 12, C.R. 398, P.R. 308 (emphasis added). Commerce also confirmed that "one component of {BMS's} reporting methodology involved assigned a 'target' count size of raw material input to each finished good" and that "BMS assigned these targets drawing *on its past production experience*." *See* Decision Memorandum, at 7, P.R. 338 (emphasis added). Commerce's conclusion that BMS "was able to demonstrate how the various components of its reporting methodology was supported by information *maintained in the normal course of business*," *see* Decision Memorandum, at 7, P.R. 338 (emphasis added), therefore refutes ASPA's argument that BMS selectively chose the smallest possible shrimp inputs for each of its products in order to report shrimp costs that are as low as possible. *See* ASPA Reply Brief, at 10.

**3. The Reasonableness of BMS's Shrimp Cost Allocation Methodology Is Demonstrated by the Resulting Low Shrimp Production Cost Variance**

BMS's shrimp cost allocation methodology – and, in particular, its assignment of standard head-on shrimp input costs – also is reasonable because the methodology resulted in a very low POI-wide cost variance. In this case, BMS's total actual POI shrimp raw material costs were 2,193,736,337,100 IDR, and BMS's assignment of starting standard head-on shrimp costs resulted in total extended standard POI raw material costs of 2,122,759,773,686 IDR, resulting in a POI-wide positive shrimp cost variance adjustment of 3.34% (i.e., (2,193,736,337,100 - 2,122,759,773,686) / 2,122,759,773,686). *See* BMS 1st Sec. D Supp. Response (May 10, 2024),

at SuppD-12, C.R. 203, P.R. 227. That BMS's overall shrimp production cost variance was low – i.e., that BMS's total extended standard shrimp costs approximated its total actual POI shrimp costs – demonstrates, *ipso facto*, that BMS's use of its target finished good count sizes and its reliance on the average POI costs of the head-on shrimp material used to produce those count sizes was reasonable and accurate.

#### 4. BMS's Shrimp Cost Allocation Methodology Was Consistent With BMS's Production Reality

BMS's shrimp cost allocation methodology not only was consistent with its normal production records and resulted in low shrimp cost production variances, but also was consistent with commercial reality. Recognizing that "smaller shrimp are less expensive than bigger shrimp," ASPA Reply Brief, at 10, and that BMS's target finished product count sizes must fall within their described ranges (e.g., the average number of shrimp per pound of 31/40 products must be between 31 and 40 pieces of shrimp), ASPA nonetheless suggests that it was unreasonable for BMS to use target finished product sizes that were at the "top end" of the count size ranges and were most likely to be the least expensive option for producing finished products within a certain size range. As such, ASPA claims that BMS's reported costs did not accurately represent its costs of producing and selling its shrimp products. But part of the reason why BMS's POI shrimp production cost variance was so low (i.e., why the assignment of standard costs was so accurate) was that the shrimp input count sizes that BMS assigned were based on and aligned with BMS's actual intended target finished good production sizes. In this case, where BMS's standard input count sizes reflected BMS's actual production experience during the POI, then it was reasonable for Commerce to find that BMS's reported shrimp cost data were reliable and consistent with BMS's actual shrimp purchase reporting. *See* Decision Memorandum, at 7, P.R. 338.

### 5. ASPA's Argument Is Based on a Misunderstanding of Count Sizes and Commercial Reality

Finally, ASPA's claim that "by choosing the smallest possible shrimp *inputs* for each of its products, BMS has reported shrimp costs that are as low as possible" is based on a mistaken assertion of (1) what count sizes mean in the commercial world, and (2) what size shrimp inputs BMS could use to produce particular size finished shrimp products. *See* ASPA Reply Brief, at 10 (emphasis added). ASPA suggests to the Court that to produce finished shrimp products of a particular size range, every *individual* shrimp must fall within that range (e.g., to produce a 1-pound bag of size 31/40 shrimp, every shrimp in the bag must be between 1/31 and 1/40 of a pound). *See id.*; *see also* ASPA Reply Brief, at 5 (positing, for example, that shrimp with a finished size count over 41 could not be used for a 31/40 product). But ASPA is incorrect. If the target size of a 31/40 count size product is 39, that result can be achieved if 100% of the shrimp in the bag are size 39. The same result also can be achieved if 50% of the shrimp are size 38 and 50% are size 40; or if 25% are size 36, 25% are size 37, 25% are size 41, and 25% are size 42; etc., etc. Thus, shrimp outside of a particular product size range nonetheless can be (and often are) included within the finished product.

Commerce recognized this principle in theory when it requested BMS to report the count size of the finished shrimp products by the number of pieces of shrimp *per pound* (and not by the size of the individual shrimp pieces). *See* ASPA's Brief, at 7 (describing the shrimp product characteristics requested in the questionnaire). And Commerce recognized this principle in practice when it verified that if BMS did "not have sufficient raw shrimp of the ideal HO count size to produce their 'target' count-size finished products, they may use other sizes" to produce the target count-size finished product. *See* Decision Memorandum, at 7, P.R. 338. Once a target count size is adopted, the ideal HO input then needed to produce that target size thus

mathematically becomes the mid-point of possible HO input sizes, and not the smallest input or lowest cost input. Therefore, contrary to ASPA's argument, after properly verifying BMS's cost responses, Commerce appropriately found that BMS's cost reporting reasonably reflected its costs of production and that there was no misreporting or underreporting of costs. 19 U.S.C. § 1677b(f)(1)(A); BMS Cost Verification Report (Aug. 6, 2024), at 11-13, C.R. 398, P.R. 308.

## II. CONCLUSION

For the reasons stated above, BMS respectfully requests that this Court either disregard (as untimely) or reject Plaintiff American Shrimp Processors Association's arguments on pages 9-12 of its April 10, 2026, 2025, Reply Brief in Support of Its Motion for Judgment on the Agency Record, ECF No. 21, and affirm Commerce's final antidumping duty determination regarding frozen warmwater shrimp from Indonesia.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Dated: September 18, 2026

Counsel to PT Bahari Makmur Sejati

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>Plaintiff,<br>v.<br><br>UNITED STATES,<br><br>Defendant,<br>and<br><br>PT Bahari Makmur Sejati,<br><br>Defendant-Intervenor. | Court No. 25-00027 |

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Trade Pacific PLLC certifies that the foregoing PT Bahari Makmur Sejati Response Brief, dated September 18, 2026, complies with the word-count limitation described in the Standard Chambers Procedures. The response brief contains 4,110 words according to the word-count function of the word-processing software used to prepare this brief.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink

**TRADE PACIFIC PLLC**
700 Pennsylvania Ave., SE, Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel to Defendant-Intervenor
PT Bahari Makmur Sejati

September 18, 2026